757 F.2d 301
 244 U.S.App.D.C. 226, 53 USLW 2473
 CENTRAL & SOUTHERN MOTOR FREIGHT TARIFF ASSOCIATION, INC.,
et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Regular Common Carrier Conference, Inc., American Trucking
Associations, Inc., Eastern Central Motor Carriers
Association, Inc., Interstate Carriers Conference, Groendyke
Transport, Inc., Intervenors.
HOUSEHOLD GOODS CARRIERS' BUREAU, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Groendyke Transport, Inc., Intervenor.
The EASTERN CENTRAL MOTOR CARRIERS ASSOCIATION, INC. and the
Regular Common Carrier Conference, Inc., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Chemical Leaman Tank Lines, Inc., et al., International
Transport, Inc., Refrigerated International Cargo Haulers,
Inc., Groendyke Transport, Inc., Youngblood Transportation
Systems, Inc., Coastal Tank Lines, Inc., Central Transport,
Inc., Fresh Express, Inc., et al., Allstate Carriers, Inc.,
et al., Schneider Transport, Inc., et al., DSI Transports,
Inc., Central & Southern Motor Freight Tariff Association,
Inc., et al., J.R.S. Leasing Charter, Inc., L.R.C. Truck
Lines, Inc., Carnaco Transport, Inc., Riverside
Transportation, Inc., Quality Operations, Inc., R.B.C.
Transportation, Inc., Southern Motor Carrier Rate
Conference, Clearfield Transportation Company, Inc., Miller
Transporters, Inc., Allied Van Lines, Inc., Intervenors.
The EASTERN CENTRAL MOTOR CARRIERS ASSOCIATION, INC., et
al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
 Nos. 83-1581, 83-1740, 83-1761 and 83-1973.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 9, 1984.
Decided March 19, 1985.
As Amended March 29, 1985.
 
 Donald E. Cross, Thomas Auchincloss and Elliott Bunce, Washington, D.C., with whom Bryce Rea, Jr., Washington, D.C., John W. McFadden, Jr., Arlington, Va., John C. Bradley, J. Curtis Bradley, III, Kim D. Mann, Great Falls, Va., and Kevin M. Williams, Washington, D.C., were on the joint brief, for petitioners/intervenors in Nos. 83-1581, 83-1740, 83-1761 and 83-1973. Patrick McEligot, William Kenworthy, F.H. Lynch, Jr., William W. Pugh, Robert A. Wilson and Leo C. Franey, Washington, D.C., entered appearances for petitioners/intervenors.
 Craig M. Keats, Atty. I.C.C., Washington, D.C., with whom John Broadley, General Counsel, and Ellen D. Hanson, Associate General Counsel, Interstate Commerce Commission, and Robert B. Nicholson and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 
 
 1
 Charles H. White, Jr., Washington, D.C., for intervenor Refrigerated International Cargo Haulers, Inc. in No. 83-1761.
 
 
 2
 Alvin J. Meiklejohn, Jr., Denver, Colo., was on the brief for intervenor Groendyke Transport, Inc. in Nos. 83-1581, 83-1740, 83-1761 and 83-1973.
 
 
 3
 Edward J. Kiley, William H. Shawn, Alan J. Thiemann and Robert R. Harris, Washington, D.C., were on the brief for intervenors Chemical Leaman Tank Lines, Inc., et al. in No. 83-1761. Robert R. Harris entered an appearance for intervenor Allied Van Lines, Inc. in No. 83-1761.
 
 
 4
 Thomas A. Callaghan, Jr. and Frederic D. Houghteling, Washington, D.C., were on the brief for intervenor Interstate Carriers Conference in No. 83-1581.
 
 
 5
 William H. Borghesani, Jr., Michael F. Morrone and Timothy Brown, Washington, D.C., were on the brief for intervenors Carnaco Transport, Inc., et al. in No. 83-1761.
 
 
 6
 Daniel C. Sullivan and Vyta P. Ambutus, Chicago, Ill., were on the brief for intervenors Schneider Transport, Inc., et al. in No. 83-1761.
 
 
 7
 E. Stephen Heisley and Lester R. Gutman, Washington, D.C., were on the brief for intervenors Central Transport, et al. in No. 83-1761.
 
 
 8
 Richard B. Felder, Washington, D.C., was on the brief for intervenor International Transport in No. 83-1761.
 
 
 9
 Marshall Kragen, Washington, D.C., was on the brief for intervenors Allstate Carriers, et al. in No. 83-1761.
 
 
 10
 Harold D. Miller, Jr., Jackson, Miss., was on the brief for Miller Transporters in No. 83-1761.
 
 
 11
 Nelson J. Cooney and Kenneth E. Seigal, Washington, D.C., were on the brief for intervenor American Trucking Associations, Inc. in No. 83-1581.
 
 
 12
 Charles Ephraim and James F. Flint, Washington, D.C., entered appearances for intervenor Youngblood Trucklines in No. 83-1761.
 
 
 13
 Leonard R. Kofkin, Chicago, Ill., entered an appearance for intervenor Central Transport, Inc. in No. 83-1761.
 
 
 14
 Ronald N. Cobert and Robert L. Cope, Washington, D.C., entered appearances for intervenor Fresh Express, Inc., et al. in No. 83-1761.
 
 
 15
 Joseph Winter, Atlanta, Ga., entered an appearance for intervenor J.R.S. Leasing Charter, Inc. in No. 83-1761.
 
 
 16
 Mark J. Andrews, Washington, D.C., entered an appearance for intervenor Clearfield Transportation Company, Inc. in No. 83-1761.
 
 
 17
 Kevin M. Williams, Arlington, Va., entered an appearance for intervenor Regular Common Carrier Conference, Inc. in No. 83-1581.
 
 
 18
 Before WRIGHT and SCALIA, Circuit Judges, and WILKEY,* Senior Circuit Judge.
 
 
 19
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 20
 This appeal consolidates four petitions to set aside, in whole or in part, orders of the Interstate Commerce Commission exempting motor contract carriers of property from the Motor Carrier Act's requirements to file tariffs. We uphold the Commission's statutory authority to relieve motor contract carriers from the tariff-filing requirements. We also find reasonable the Commission's use of that authority to exempt all such carriers of property. Because we affirm the Commission's decision to exempt all such carriers, we do not separately examine the Commission's orders relating to exemptions of individual carriers.
 
 I. FACTS
 
 21
 Under the Motor Carrier Act as amended,[1] motor contract carriers are required to file tariffs stating their actual and minimum rates.[2] (As defined by the Act, motor contract carriers of property provide "motor vehicle transportation of property for compensation under continuing agreements" to one or more shippers, by dedicating equipment or by meeting the shippers' distinct needs.[3] Motor common carriers, in contrast, hold themselves "out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both."[4] )
 
 
 22
 The Motor Carrier Act also authorizes the Interstate Commerce Commission to exempt contract (but not common) carriers from the tariff-filing requirements. The exemption available to contract carriers appears in title 49 of the United States Code as follows:
 
 
 23
 The Commission may grant relief from ... [this section or subsection to contract carriers] when relief is consistent with the public interest and the transportation policy of section 10101 of this title. The Commission may begin a proceeding under this section [or subsection] on application of a contract carrier or group of contract carriers....[5]
 
 
 24
 Although Congress has amended the original Motor Carrier Act several times since 1935 (as will be discussed in more detail below), the tariff-filing requirements and the Commission's accompanying exemption power have remained intact.
 
 
 25
 In order to keep separate the four petitions consolidated in this action, we present the factual material under the case caption to which it relates.
 
 
 26
 A. Central & Southern Motor Freight Tariff Association, Inc. v. United States, No. 83-1581, and Household Goods Carriers' Bureau, Inc. v. United States, No. 83-1740
 
 
 27
 In 1981, following passage of the Motor Carrier Act of 1980, the Interstate Commerce Commission demonstrated a marked change in its attitude toward exemption of motor contract carriers from the tariff-filing requirements. The Commission had addressed the scope of its exemption authority only three times between 1935 and 1980.[6] In the following three years, however, it exercised its long-dormant power more often than it had in the first forty-five years of that provision's existence.[7]
 
 
 28
 As the pace of tariff-filing exemptions quickened, the demands for exemption extended to broader, class-wide relief. In June 1982 the staff of the Federal Trade Commission asked the Commission to institute a rulemaking proceeding to consider eliminating the tariff-filing requirements for all motor contract carriers.[8] On 29 July 1982 the Contract Carrier Conference of the American Trucking Association (now the Interstate Carriers Conference) applied for the same class-wide relief.[9]
 
 
 29
 The Commission responded by initiating a legislative-type rulemaking proceeding in a notice issued 12 December 1982.[10] In that notice the Commission tentatively decided to promulgate an exemption for all motor contract carriers, both of property and of persons.[11]
 
 
 30
 After considering initial and reply comments on its analysis in January and February of 1983, the agency served a final decision on 27 May 1983.[12] That decision exempted motor contract carriers of property from filing rate schedules with the Commission.[13] Petitioners and intervening petitioners in No. 83-1581 challenged the statutory authority and record support for the Commission's broad exemption by filing a petition in this court on 3 June 1983.[14] The Household Goods Carriers' Bureau filed a separate petition, denominated No. 83-1740, to remove carriage of household goods from the broad exemption even if the Commission's decision is otherwise upheld.[15]
 
 
 31
 B. Eastern Central Motor Carriers Association, Inc. v. United States, No. 83-1761
 
 
 32
 The Commission's new attitude toward granting exemptions from the tariff-filing requirements did not go unnoticed. After the spring of 1982, when the agency granted a final exemption to UTF Carriers, Inc.,[16] the Commission was inundated with hundreds of exemption applications from individual motor contract carriers. In order to cope with the flood of applications, the Commission streamlined its decisionmaking process by abbreviating the notice given, by shortening the pertinent comment period, and by "batching" the previously separate notices and exemptions of individual carriers.[17]
 
 
 33
 It was also during this period that the Commission began to issue "provisional" exemptions--exemptions which were effective unless and until the Commission received adverse comment indicating that exemption was not warranted.[18]
 
 
 34
 On 12 April 1983, two petitioners in this proceeding, the Eastern Central Motor Carrier Association, Inc. and the Regular Common Carriers Conference, objected to "provisional exemptions" on the ground that the Commission could (and would) leave the provisional exemptions in effect indefinitely simply by failing to render a final decision. The so-called "provisional" exemptions, in petitioners' eyes, were final exemptions in disguise. Petitioners accordingly sought mandamus in this court to stop the practice.[19]
 
 
 35
 In response to petitioners' mandamus request, the Commission promised to issue no further provisional exemptions in contested cases until after a decision was rendered, and to issue final decisions within twentyone days in all pending contested cases.[20] In accordance with this court's mandate and the Commission's undertaking, the Commission on 5 July served two decisions consolidating and granting exemptions filed by 198 individual motor contract carriers.[21] Petitioners and intervening petitioners sought review in this court on 14 July 1983.[22]
 
 
 36
 C. Eastern Central Motor Carriers Association, Inc. v. United States, No. 83-1973
 
 
 37
 Less than a week later, on 20 July 1983, this court stayed the effectiveness of the Commission decisions in both the rulemaking and the individual proceedings and consolidated the three petitions.[23] On 29 July we denied respondents' and intervenors' motions for reconsideration, rehearing, and vacation of the stays and offered clarification of our order of 20 July.[24] We emphasized that our stay did not interfere with the agency's ongoing disposition of individual exemption applications pending before it:
 
 
 38
 Individual exemption proceedings have not been stayed; we do no more than return each to the status quo existing prior to the July 5 orders. Rather, what has been stayed is the Commission's summary disposition of all pending individual exemption proceedings simply by reference to the findings and general conclusions made in issuing the prior industry-wide tariff exemption in Ex Parte MC-165.... Each such application must, pursuant to past practice, be examined on its own merits.[25]
 
 
 39
 On 29 August the Commission decided that it should issue standards governing disposition of pending individual applications, because our stay prevented the agency from granting exemptions by reference to its broad exemption. On 7 September 1983 the Commission served a notice summarizing this court's actions and listing such standards.[26] Petitioners and intervening petitioners sought review and a stay on 12 and 13 September respectively.[27] On 14 September 1983 we added the petition in No. 83-1973 to this consolidated appeal.[28] On 23 September we denied petitioners' request for a stay.[29]
 
 
 40
 We lifted our order staying the Commission's broad exemption and the 198 individual exemptions on our own motion on 28 September.[30] We reasoned that petitioners had not demonstrated the irreparable harm required for a stay, because "revenues and customers lost to competition which can be regained through competition are not irreparable," and because "[p]etitioners may seek to eliminate the alleged competitive advantage given to the contract carriers simply by engaging in the contract carrier trade themselves."[31]
 
 D. Preview of Analysis
 
 41
 Because we have, by vacating our stay, allowed the Commission's broad exemption to go into effect, petitioners' challenge of the criteria governing disposition of individual petitions (the 7 September 1983 order) is moot.[32]
 
 
 42
 Moreover, even if this court's stay remained in effect, the challenges to the individual exemptions are moot by virtue of our decision herein to affirm the Commission's broad exemption. We therefore do not set forth our views on the petitions challenging exemptions granted to individual motor contract carriers.
 
 
 43
 To deal clearly with the myriad petitioners, respondents, and intervenors and the plethora of arguments they raise, we adopt two conventions. First, rather than cite and state each briefs' unique shading of a particular argument, we have collected all the contentions and reordered and responded to them in the analysis that follows. In addition, for the sake of convenience we henceforth refer to all petitioners and intervening petitioners collectively as "petitioners" and all respondents and intervening respondents collectively as "respondents." Before embarking on our analysis, a brief recitation of the history of motor carrier regulation is in order.
 
 
 44
 II. A PRECIS OF THE HISTORY OF MOTOR CARRIER REGULATION
 
 
 45
 Motor carrier regulation has evolved from a regime designed to protect common carriers against competition from contract carriers to one in which common and contract carriers are to compete with each other and with other modes of transportation as well.
 
 
 46
 Congress designed the Motor Carrier Act of 1935,[33] in large part, to prevent depression-squeezed contract carriers from encroaching on the domain of common carriers.[34] Congress employed several devices to this end. Among other restrictions, the 1935 Act defined contract carriage to be a long-term or specialized service and generally barred "dual operations" (thereby preventing a carrier from serving shippers of both contract and common carriage), unless the Interstate Commerce Commission ordered otherwise "for good cause shown."[35] The Commission imposed further requirements, specifying that contracts be in writing, of continuing duration, and of a prescribed form.[36] Additionally, Congress required contract carriers to file a schedule setting out minimum rates below which they could not charge.[37] Notwithstanding its goal of insulating common carriers from the depredations of contract carriers, Congress authorized the Commission to exempt contract carriers from the tariff-filing requirements.[38]
 
 
 47
 In 1957 Congress strengthened the protections of common carriers found in the 1935 Act.[39] The objective, according to the responsible committee, was "the promotion and protection of adequate and efficient common-carrier service by motor vehicle in the public interest. The regulation of contract carriers was designed with that end, among others, in view.[40] With respect to tariff filing in particular, Congress required contract carriers to file their actual rates in addition to their minimum rates.[41] The motivating idea was that of "open pricing," under which common carriers were to enjoy "equality in rate publication"[42] to prevent diversion of traffic to contract carriers and to ensure uniform and predictable rates. "Open pricing" was intended to remedy the disadvantage of common carriers who "are unable to determine whether the minimum rate filed is the rate charged to all shippers for the same service."[43] The many restrictions imposed on the operations of contract carriers make clear that the legislative intent was not to put contract and common carriers on the same competitive plane and let the better carrier win. Rather, the aim was unabashed protection of common carriers.[44] Notwithstanding this goal, Congress retained the Commission's discretionary authority to exempt contract carriers from the tariff-filing requirements.
 
 
 48
 Beginning in the 1970s, the Commission began unraveling the ties that bound together this pervasive regulatory framework. In serial fashion the agency relaxed entry standards,[45] awarded liberal grants of operating authority to contract carriers,[46] authorized the simultaneous holding of contract and common carrier authority,[47] and revoked its earlier presumption that a contract carrier could not serve more than eight shippers without becoming a common carrier.[48]
 
 
 49
 The Motor Carrier Act of 1980 largely followed the Commission's lead. After more than eighteen months of study,[49] Congress concluded that the existing "statutes governing Federal regulation of the motor carrier industry are outdated and must be revised to reflect the transportation needs and realities of the 1980's."[50] Congress concluded that the Commission had gone too far in attempting to establish "master licensing," under which the Commission had planned to make prospective findings of a public need for certain types of expanded services.[51] But in most other respects the new law codified the Commission's decisions and adopted the agency's approach to motor carrier regulation--an approach emphasizing market discipline, in contrast to public utility-style ratemaking, as the principal regulator of motor carriers.[52]
 
 
 50
 One of the objectives of the new Act was "remov[al of] many of the obstacles that have kept motor contract carriers from realizing their full potential."[53] To accomplish this goal, Congress amended the national transportation policy "to promote competitive and efficient transportation services."[54]
 
 
 51
 Specifically, the 1980 Act made contract carriage more attractive to motor carriers by (1) removing the prohibition against dual operations (thereby allowing the same carrier to operate as both a contract and a common carrier),[55] (2) removing the limit on the number of shippers a contract carrier could serve,[56] (3) removing restrictions on the nature of shippers, commodities shipped, and permissible geographic scope of contract carrier permits,[57] (4) allowing contract carriers to serve freight forwarders,[58] and (5) allowing contract carriers to utilize trailer-on-flatcar service.[59] Many of these provisions ratified prior decisions of the Commission.[60]
 
 
 52
 Despite the fact that the Motor Carrier Act of 1980 did not amend the text of the exemption provision, the Commission believes that the facial breadth of the provision, in light of the amended transportation policy which that provision explicitly incorporates by reference, entitles it to exempt all motor carriers of property from the tariff-filing requirements. Before evaluating this claim, however, we must resolve two antecedent issues, one jurisdictional and one procedural.
 
 III. THRESHOLD ISSUES
 
 53
 A. Petitioners' Standing to Challenge the Commission's Exemption Decisions
 
 
 54
 One respondent challenges the standing of petitioners Eastern Central Motor Carriers Association, Inc. and Regular Common Carrier Conference, Inc. This respondent claims that some members of these organizations are not averse to the Commission's broad exemption and may even hold contract carriage authority themselves.
 
 
 55
 Respondent's standing analysis is irrelevant and misguided. It is irrelevant because even if these two petitioners lack standing, other (individual) petitioners clearly have standing to raise (and have raised) identical claims. It is misguided because, according to the Supreme Court, an association has standing[61] if "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action.[62]B. Petitioners' Asserted Right to Formal Adjudication of Tariff-Filing Exemptions
 
 
 56
 Petitioners claim that the Motor Carrier Act authorizes exemptions solely on a case-by-case basis and that they were entitled to formal adjudication of their grievance, including the right to oral presentation and cross-examination of witnesses. They contend that the Commission's rulemaking impermissibly ignored these procedural safeguards.
 
 
 57
 We agree that petitioners are entitled to a "hearing." Although the version of the exemption provisions appearing in the United States Code requires only that the Commission "begin a proceeding,"[63] the original section 218(a) enacted by Congress provided expressly for a hearing:
 
 
 58
 Any such carrier or carriers, or any class or group thereof may apply to the Commission for relief from the provisions of this paragraph, and the Commission may, after hearing, grant such relief to such extent and for such time, and in such manner as in its judgment is consistent with the public interest and the national transportation policy declared in this Act.[64]
 
 
 59
 The 1978 recodification of section 218(a), which substituted "begin a proceeding" for "after hearing," was not intended to effect any substantive change.[65] Accordingly, we hesitate to say that Congress eliminated the hearing requirement in 1978.
 
 
 60
 But the language of the exemption--which expressly contemplates class-wide relief--rejects the notion that the Commission may grant exemptions solely on an ad hoc basis. Petitioners' analysis runs further awry when it assumes that "hearing" denotes a formal, trial-type proceeding. The Administrative Procedure Act[66] does not require formal proceedings unless the pertinent statute in some way indicates that the required hearing on a generalized issue is "on the record."[67] Under settled case law, in the absence of specific direction from Congress that a hearing is to be conducted "on the record" (or words to that effect), informal proceedings such as notice-and-comment rulemaking are entirely satisfactory.[68]
 
 
 61
 Recognizing that it is the agency's choice, in the first instance, whether to change policy through notice-and-comment rulemaking or case-by-case adjudication,[69] we cannot say that the Commission--faced with a problem afflicting hundreds, perhaps thousands, of contract carriers--was unreasonable to select rulemaking.[70] Courts must refrain from substituting their judgment as to proper procedure for that of the agency.[71]
 
 
 62
 IV. THE COMMISSION'S STATUTORY AUTHORITY FOR EXEMPTING ALL
 
 MOTOR CONTRACT CARRIERS OF PROPERTY FROM
 TARIFF-FILING REQUIREMENTS
 A. Standard of Review
 
 63
 Although "courts are the final authorities on issues of statutory construction,"[72] the Supreme Court has recently instructed us, in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,[73] to give "considerable weight ... to an executive department's construction of a statutory scheme it is entrusted to administer."[74] Of particular importance to this case, the Justices cautioned that "[i]f ... the court determines [that] Congress has not directly addressed the precise question at issue, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute.[75]
 
 
 64
 Because the exemption provisions assign broad authority to the Commission--requiring only that exemption be in the "public interest" and consistent with a potpourri of ill-defined and conflicting ad hoc admonitions combined to form, rather optimistically we think, a "national transportation policy"--the agency's interpretive domain is at its zenith and the judicial license at its nadir. Congress's broad delegation to the Commission constrains us to uphold the Commission's authority as a reasonable, though not singular, interpretation of the exemption provisions.
 
 
 65
 B. The Commission's Construction is Permissible
 
 
 66
 The Commission's assertion of authority is in harmony with the facially sweeping text of the statutory exemption provisions. These provisions uniformly sanction relief "when relief is consistent with the public interest and the transportation policy of section 10101 of this title."[76] The original provisions--whose substance continues in force despite the semantic changes wrought by the 1978 recodification--stressed the breadth of the Commission's discretion by stating that "the Commission may ... grant such relief to such extent and for such time, and in such manner as in its judgment is consistent with the public interest and the [national transportation] policy."[77] What we have, to use the Fifth Circuit's words, is a congressional charge to "go forth and do good."[78] The delegation to the Commission is as broad as Congress could make without giving the Commission carte blanche. If Congress intended the Commission's exemption authority to be "specific and limited," as petitioners assert,[79] we would expect at least some limiting criteria--criteria which are conspicuously absent.[80] We give great weight to this straightforward reading of the statutory text.[81]
 
 
 67
 Other courts have likewise liberally construed facially broad authority to exempt shippers from various restraints. For example, in American Trucking Associations, Inc. v. Interstate Commerce Commission,[82] the Fifth Circuit affirmed an Interstate Commerce Commission decision exempting trailer-on-flatcar and container-on-flatcar service from regulation.[83] The exemption authority directed the Commission to exempt rail carriers when consistent with the rail transportation policy and when either the exempted transaction or service is of limited scope or the exemption does not leave shippers vulnerable to abuse of market power.[84]
 
 
 68
 This circuit has similarly upheld broad Commission exemptions predicated on ill-defined statutory criteria. In our own American Trucking Associations v. Interstate Commerce Commission,[85] we affirmed a decision by the Commission to exempt motor carriers from a statutory prohibition against holding both common and contract authority over the same route or in the same area,[86] pursuant to a proviso permitting exemption if the Commission "shall find that such certificate and permit may be held consistently with the public interest and the [national transportation] policy."[87] We began "with the well settled principle that in construing statutory language we look first to the wording of the statute and that such wording should be given its plain, obvious and rational meaning."[88]
 
 
 69
 We also held ourselves bound by the " 'literal or usual meaning' "[89] of the words in a statute when we affirmed a tariff-filing exemption granted by the Civil Aeronautics Board[90] pursuant to authority permitting exemption when "appropriate."[91] Admittedly, the language and legislative history of all these exemption provisions differ from that of the provision at hand.[92] But these peripheral distinctions should not cloud the precedent for giving facially broad exemption authority the full sweep suggested by the words of a statute.
 
 
 70
 The Commission's interpretation appears all the more reasonable considering petitioners' arguments for confining the exemption power to "specific and limited circumstances."[93] We can see no way to cabin the Commission's authority without rewriting the statutory text, an act unquestionably outside the province of the judiciary.
 
 1. A rule of statutory construction
 
 71
 Petitioners first argue that blanket or categorical exemptions are permitted only in extraordinary circumstances. The cited cases, however, reveal that this disfavor extends only to agencies' attempts to create exemptions not authorized by statute, not express power anchored in the broad terms of an enactment.[94]
 
 
 72
 2. Arguments based on the Motor Carrier Act of 1957
 
 
 73
 Petitioners make much of the fact that the 1957 Motor Carrier Act strengthened the tariff-filing requirements (by requiring the filing of rate schedules containing actual as well as minimum rates) and that the 1980 Act failed to amend it. Although the import of this historical observation is not self-evident, petitioners' argument seems to take two forms. First, petitioners appear to argue that, because Congress did not rescind the tariff-finding requirements when it had the opportunity to do so in 1980, the Commission may not do so now. Building on their observation that Congress could have amended the tariff-filing requirements in 1980, petitioners add that before the 1980 Act, the Commission enforced the tariff-filing requirements and granted exemptions rarely and only on a limited basis. Petitioners infer--from Congress's failure to amend the filing requirements--a positive congressional intent that they continue to be enforced with but limited exceptions. For petitioners, legislative inaction is pregnant with meaning.
 
 
 74
 Courts, however, recognize that legislative inaction is a dangerous foundation for statutory construction. As we recently observed:
 
 
 75
 The general rule is that congressional inaction or congressional action short of the enactment of positive law, like postenactment legislative history, is often entitled to no weight in construing a statute.... Inaction by Congress is due generally to reasons too diffuse, ephemeral, and ultimately unaccountable for it to confine this process of regulatory adaptation to changing circumstances.[95]
 
 
 76
 Legislative inaction is a particularly ambiguous and unreliable indicator in this case. The ambiguity stems from the fact that legislative inaction in this instance is a two-edged sword. While Congress did not tamper with the tariff-filing requirements, neither did it amend the broadly-worded exemption provisions.[96] A detached observer would conclude that it was unreasonable to expect Congress to do so--Congress could not have broadened the exemption power without totally abdicating the lawmaking function to the agency.
 
 
 77
 Moreover, the legislative history indicates that petitioners' "congressional-acquiescence-by-silence" inference is not reliable. The Senate report specifically cautions that Congress should not be presumed to have removed all the unnecessary regulation that the legislature would like pruned: "In addition to the specific provisions of this bill, there are other areas where the Committee did not act, either because it approved of current Commission policy or felt that the Commission was the proper forum for the interested parties to address the issues."[97] There is nothing to indicate that Congress exhausted the deregulatory agenda it set in the 1980 Motor Carrier Act. For all that we can infer from the lack of mention of tariff filing in the pertinent hearings and committee reports, Congress did not exempt contract carriers because contract carriers did not ask it to do so.
 
 
 78
 More fundamentally, we cannot equate Congress's treatment of the tariff-filing requirements with legislative neglect. Although Congress amended neither the requirements nor the exemption authority by their terms, it did what was functionally equivalent--it amended the national transportation policy (which the exemption provision incorporates by reference) to reduce unnecessary federal regulation and to substitute the discipline of the marketplace in its stead.[98]
 
 
 79
 Congress's revision of the national transportation policy controls the breadth of the Commission's exemption power. The text of the exemption provision authorizes "relief when relief is consistent with the public interest and the transportation policy of section 10101 of this title."[99] The legislative history of the 1980 Motor Carrier Act reiterates Congress's command, declaring that "[t]he National Transportation Policy sets the tone for the regulatory structure and is the basis for determining the meaning of statutory provisions."[100]
 
 
 80
 The recently revised national transportation policy, as described in part II above, is the philosophical standard-bearer of the 1980 Act and supports much broader exemptions than would have been appropriate under the earlier protectionist and anticompetitive legislation on which petitioners pin their hopes. In particular contrast to the 1957 legislation, the new standard provides that "it is the policy of the United States Government ... to promote competitive and efficient transportation services [by motor carrier]."[101] To borrow the words of the authoritative House Committee report, "[t]he legislation establishes a new Federal Policy which is to promote a competitive and efficient motor carrier industry."[102] "It is clearly the Committee's intent that the Commission must recognize the importance of competition and efficiency in motor carrier operations as the most desirable means for achieving national transportation goals and objectives."[103] Although the Commission's broad exemption would be odd and out of place if the calendar read 1957, it is in touch with the market-oriented regulatory policy of the 1980s.[104]
 
 
 81
 The Commission amply grounded its broad exemption in the newly-revised national transportation policy:
 
 
 82
 We recognize that one of the purposes of the 1957 legislation, which was initiated by the Commission, may have been to protect common carriers from competition from contract carriers and that public availability of competitors' rates was one of the ingredients of that protection. But a quarter of a century has elapsed since then, and many of the assumptions underlying the role of transportation regulation have substantially changed.
 
 
 83
 Whatever may have been the goals of rate regulation in 1957, the Motor Carrier Act [of 1980] has revised the [Interstate Commerce] [A]ct to mandate enhanced competition and efficiency. We think it is beyond question that the elimination of the tariff filing requirement will promote both aspects of this goal. The threat of new entry and freedom over prices and services are at the core of the new regulatory scheme. The action taken here will simplify new entry since it will eliminate the delay that accompanies the filing of tariffs for new contract customers. Similarly, carrier and shipper willingness to experiment with new price/service options will not be dampened by the burdensome need to reflect each such change in an additional tariff filing.[105]
 
 3. Parsing the statutory text
 
 84
 Raising the debate to a higher, lexicographical plane, petitioners object to an industry-wide exemption because the exemption authority limits relief to (at most) a "group of contract carriers"[106] and, according to any dictionary of the English language, the term "group" can only encompass some subset of a given set, here the set of motor contract carriers. An industry-wide exemption, petitioners contend, is obviously inappropriate. Petitioners' argument--though intriguing--depends on a faulty factual premise. The Commission's exemption does not cover all motor contract carriers--passenger carriers (such as bus companies) must still file tariffs.[107]
 
 4. Arguments based on the statute's design
 
 85
 Citing the maxim that disfavors interpretations of statutory provisions which render other provisions of the same act superfluous or inoperative,[108] petitioners argue that the Commission's broad exemption renders important components of the Motor Carrier Act unenforceable. Specifically, they contend that if implemented the tariff-filing exemption will as a practical matter nullify the Commission's power to suspend and investigate rates[109] and the right of common carriers and the public to challenge those rates in complaint proceedings.[110]
 
 
 86
 Assuming that we agreed with petitioners that tariff filing is essential to effective rate regulation, these provisions would not be relevant because contract carriers of passengers continue to file tariffs even under the Commission's broad exemption.[111]
 
 
 87
 Moreover, published rate schedules, far from being necessary prerequisites to rate challenges, at most facilitate enforcement. Illegal rates can be exposed, complaints filed, and rates suspended without government-mandated price disclosure, just as the antitrust laws are enforced without the benefit of published prices. Indeed, the Commission's investigative power makes more sense in a regime without tariff filings than in one in which rates are a matter of public record. Exemption from tariff filing is compatible with other provisions of the statute; there is no reason to construe the exemption power narrowly.
 
 
 88
 5. Arguments based on prior administrative practice
 
 
 89
 Petitioners' penultimate contention is that the Commission has, in previous decisions addressing its exemption power,[112] authoritatively held it to be available only in narrow circumstances. They charge the Commission with departing from this policy without a reasoned explanation.[113]
 
 
 90
 As an initial matter, we find it difficult to believe that the Commission's three cryptic exemption cases, which are widely separated from this case in time, establish a settled rule binding on the agency here. Although it is true that the Commission's Armored Carrier decision[114] (which, as its caption implies, relieved armored carriers of valuables from compliance with the tariff-filing requirements[115]) exempted a rather small category of motor contract carriers, there is nothing in the opinion to suggest that this relief exhausted the Commission's exemption power. Certainly there is nothing in the case to suggest that it established standards governing future uses of the exemption authority. The cases cited by petitioners simply explain why relief is granted or denied in the particular proceeding at hand.[116]
 
 
 91
 Admittedly, the Commission's two decisions denying exemptions to contract carriers[117] necessarily held--at least by implication--that the tariff-filing requirements were not per se inconsistent with the public interest and the national transportation policy as of 1957. But that policy was amended by the Motor Carrier Act of 1980. And the public interest presumably changed in tune with the times. Congress monitored developments in the motor carrier industry and concluded that less regulation and more competition would improve motor carrier service. The Commission, perceiving the same changes, is entitled to update its policies as well.[118] Recalling the lengthy quotation in the preceding section, we cannot say that the Commission failed to provide a rationale for its supposed departure from precedent.[119]
 
 
 92
 6. Arguments premised on the legislative policy undergirding the act
 
 
 93
 Petitioners rightly point out that exceptions to a statute are not to be construed in such a manner that they "defeat rather than further the purpose of Congress."[120]
 
 
 94
 The short answer to this observation is that the Commission's broad exemption accomplishes nothing of the sort. Putting aside for the moment the common sense reading of the Commission's facially broad exemption power--a power constrained only by what may be charitably described as the most "open-ended" of statutory criteria--exemption of motor contract carriers of property is, as we have shown, entirely in keeping with Congress's objectives in enacting the Motor Carrier Act of 1980.
 
 
 95
 Burrowing to the root of petitioners' contention, however, we find an assertion that, as an historical matter, the principal thrust of the various Motor Carrier Acts is to assure "competitive equality." It is this belief which leads petitioners to declare that a broad exemption from the tariff-filing requirements for contract carriers--under which common carriers remain subject to requirements to publish rates and delay their implementation for thirty days--would impermissibly upset the competitive balance reached after fifty years of motor carrier legislation.
 
 
 96
 Our review of the history of motor carrier regulation, which is set out briefly in part II, leads us to the conclusion that petitioners' "competitive equality" thesis is revisionist history. Motor carrier regulation before 1980 was designed to protect common carriers from competition of contract carriers, not to correct market failures and maintain a finely-tuned competitive balance between the two types of motor carriers. The 1980 Act to a large extent replaced protectionism and administrative regulation with the competitive oversight of the marketplace. The Commission's assertion of statutory authority to exempt a broad class of motor contract carriers is consistent with this Act.
 
 
 97
 V. REASONABLENESS OF THE COMMISSION'S DECISION TO EXEMPT ALL
 
 MOTOR CONTRACT CARRIERS OF PROPERTY FROM
 TARIFF-FILING REQUIREMENTS
 A. Standard of Review
 
 98
 Under the Administrative Procedure Act,[121] the Commission's broad exemption must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[122] "The scope of review under the 'arbitrary and capricious' standard," as the Supreme Court has recently reminded us, "is narrow and a court is not to substitute its judgment for that of the agency."[123] Our role is to determine " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' "[124] As we stated when ruling on the propriety of another tariff-filing exemption, this standard is "highly deferential."[125]
 
 
 99
 Deference is particularly appropriate when--as here--the delegation of exemption power is very broad and necessarily involves the administrative weighing of the costs and benefits of regulation.[126] "Because we lack the knowledge and experience needed to evaluate the transportation requirements of the nation, we accord the Commission a great deal of discretion and appropriately defer to its expertise."[127] The determinations we review in the next section "epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency."[128]
 
 
 100
 B. The Commission's Exemption is Consistent with the Public Interest and the National Transportation Policy
 
 
 101
 The exemption provisions authorize the Commission to "grant relief ... when relief is consistent with the public interest and the [national] transportation policy."[129] According to the Commission, "[t]he public interest lies in ready access to competitive, efficient, and reasonably priced motor carrier service when and where needed."[130] Under the recently amended national transportation policy, "it is the policy of the United States Government[,] ... in regulating transportation by motor carrier, to promote competitive and efficient transportation service."[131]
 
 
 102
 The administrative record provides substantial support for the Commission's finding that its broad exemption comports with the public interest and the national transportation policy.
 
 1. Tariff filing is unnecessary
 
 103
 a. Exemption does not put motor common carriers at an unfair
 
 
 104
 competitive disadvantage contrary to the purposes
 
 
 105
 of the Motor Carrier Acts
 
 
 106
 Petitioners insist that removal of the tariff-filing requirements for a broad class of contract carriers will impose a disproportionately heavy regulatory burden on common carriers; leave common carriers vulnerable to abusive rate-cutting, predatory pricing, and "secret pricing"; and will in general give contract carriers an unfair competitive advantage.
 
 
 107
 As an initial matter, it bears mentioning that competitive disadvantage is not necessarily contrary to the purposes of the amended Motor Carrier Act. The Act does not prescribe "competitive equality." As demonstrated in part II, the 1935 Act and the 1957 amendments were designed to insulate common carriers against competition from contract carriers, not to establish competitive equality between them. The 1980 Act is directed to promote competition in motor carrier services; it does not mandate that each type of motor carrier bear the same regulatory burden.[132]
 
 
 108
 Nor can avoidance of competitive disadvantage be inferred from the national transportation policy. The requirement of "impartial regulation" applies to "the modes of transportation subject to this subtitle."[133] ] The modes specified are motor, water, and rail carriers, among others;[134] contract and common carriers are two forms of one mode of carriage. Because the two types of motor carriers are not modes themselves, the requirement does not govern regulation affecting motor carriers alone.
 
 
 109
 In any event, petitioners' fears of competitive disadvantage are greatly exaggerated. One source of potential disadvantage is the cost of unilateral compliance with tariff-filing requirements. But although the Commission calculated the aggregate savings from its broad exemption to be substantial, it did not find the cost of rate publication to be so high as to impose a serious competitive disadvantage on individual unexempted common carriers. This conclusion is reasonable because common carriers spread the costs of filing tariffs by publishing their rates collectively through rate bureaus--contract carriers do not. For their part, petitioners totally fail to meet the Commission's claim. On the one hand, they assert that the cost of tariff filing is sufficient to put common carriers at a competitive disadvantage. And yet, on the other hand, they insist that these costs do not warrant exemption of contract carriers from tariff-filing requirements.[135] The Commission has provided a plausible explanation for its position and petitioners have given us no reason to doubt it.
 
 
 110
 Petitioners also claim that common carriers will be put at a competitive disadvantage because exemption from tariff filing will allow contract carriers to charge non-compensatory rates. As a factual matter, this concern is unfounded. Approximately 250 individual exemptions were granted by the Commission before this rulemaking.[136] No complaints were filed and historically none are.[137] Presumably potential rate-cutters are deterred by the Commission's continuing authority to investigate and suspend unlawful rates.[138] As a check on Commission nonfeasance, common carriers themselves can expose unlawful rates and file complaints[139] using the same techniques businesses use to challenge restraints on trade under the antitrust laws (which are of course also enforced without the benefit of published prices).
 
 
 111
 In addition, petitioners raise the specter of "secret pricing" if the tariff-filing requirements are lifted. But common carriers should find it even easier to expose "secret rates" than noncompensatory rates. Noncompensatory rates are by their nature a bargain for the shipper, who thus has every reason to keep quiet. With compensatory but "secret" rates, however, the shipper has an incentive to disclose the rate to start a bidding war between carriers interested in his business.[140] Publication of rates alone would not help common carriers compete for contract carriage in any event: the common carrier would still lack essential terms which are contained only in the contract.[141] Contrary to petitioners' line of reasoning, "open pricing" may even be anticompetitive--it may facilitate "price matching."[142] We find more than sufficient support for the Commission's conclusion that eliminating the tariff-filing requirements (and "open pricing" along with it) is more likely, on balance, to increase competition than it is to decrease it.[143]
 
 
 112
 Last, petitioners fear predatory pricing on the part of contract carriers. The assumption underlying this concern is that contract carriers will use "secret" and noncompensatory rates to undercut common carriers, drive them out of business, and then, when the market is cleared of competitors, raise their rates. Not only is it exceedingly unlikely that predatory pricing will go undetected, for the reasons given above, but the low barriers to entry into the trucking business (including the newly liberalized entry requirements[144] ) mean that predators cannot expect to earn monopoly profits and thereby recoup their (heavy) initial losses. This risk, considered ex ante, should dissuade potential predators from attempting to engage in predatory pricing in the first place.[145]
 
 
 113
 Not only is the purported competitive disadvantage greatly oversold, but even if petitioners' claims are taken at face value the common carrier system will not be dismantled. As we stated in our order lifting the stay of the Commission's orders pending appeal: "Petitioners may seek to eliminate the alleged competitive advantage given to the contract carriers simply by engaging in the contract carrier trade themselves."[146] Under the 1980 Motor Carrier Act, carriers no longer have to choose between common and contract carriage; instead they may serve both trades. Thus, if the Commission's exemption--by making contract carriers more efficient relative to common carriers--causes some common carriers to become contract carriers, the upshot will be a decline in common carriage, not common carriers, because common carriers may choose to acquire contract authority under the newly liberalized entry standards and serve the very same trade they had previously served, albeit in a different capacity. It makes no difference to the carrier whether its revenues are derived from common or contract carriage. And even if existing common carriers decide to convert completely to serve contract carriage, then "the ease with which the trucking business can be entered assures that coverting [sic] carriers will be replaced without meaningful disruption."[147]
 
 
 114
 On the remote possibility that contract carriers enjoy any vestigial advantage, the utility-maximizing course of action is the one freeing common carriers from the regulatory ties that bind[148] rather than granting, to use the Commission's words, petitioners' "unappealing request for equality of disadvantage."[149] Any residual competitive disadvantage is inherent in the common carrier mode of service.[150]
 
 
 115
 If, despite the Commission's expert prediction, common carriers are adversely affected by the exemption from tariff filing, the agency can take action when the threat materializes. "[A]t this point, the litany of horrors presented by petitioners represents no more than convenient speculation designed to restore the comfortable status quo that existed before the 1980 Act."[151]
 
 
 116
 b. Unlawful discrimination
 
 
 117
 Unlike common carriers, contract carriers can discriminate among shippers. They are not subject to the anti-discrimination provisions or the proscription against unreasonably high rates.[152]
 
 
 118
 Petitioners fear that contract carriers holding authority to transport common carriage, once exempted from tariff filing, will be able to discriminate among shippers of common carriage. We do not see this disparate treatment as a realistic possibility. In one suggested scenario, a motor carrier operating as both a common and a contract carrier negotiates noncompensatory contract rates with a favored shipper and charges high common carrier tariff rates to other similarly situated (but disfavored) shippers. The discriminating carrier, however, cannot exact high common carrier rates from shippers who ex hypothesi are similarly situated with a shipper obtaining low contract rates, because they too could get low rates from other contract carriers. As the Commission pointed out, "[w]ith or without contract carrier tariffs, the competition from other carriers will continue to protect common carrier shippers from unreasonably high prices."[153]
 
 
 119
 In addition, this scenario is realistic only if the noncompensatory contract rate remains secret, because the discriminating carrier must conceal his unlawfully low rate. But a contract carrier may attempt to conceal his rates now simply by publishing nominally nondiscriminatory rates and altering the service provided to effect the discriminatory treatment. In fact, as demonstrated above, the Commission and aggrieved carriers can expose discriminatory rates even when tariffs are not published.[154]
 
 
 120
 In a second scenario, a carrier transporting both common and contract carriage negotiates low (possibly noncompensatory) contract rates with a shipper as the quid pro quo for a specific amount of common carriage. This scenario fails to reveal any unlawful discrimination among shippers of common carriage. Moreover, the scheme presumes--unrealistically, as we have seen--that the contractual terms will remain secret. If the contract rates were not compensatory (or if the facts suggested unlawful tying under the antitrust laws), then the Interstate Commerce Commission, the Federal Trade Commission, and aggrieved carriers all have the proven ability to expose the unlawful conduct and bring the law-breaker to justice. Reassuringly, the Commission here points out that it "has been issuing tariff filing exemptions on an individual basis for some time without the occurence [sic] of any notable harm."[155]
 
 2. Tariff filing is burdensome
 
 121
 In light of the negligible benefits of tariff filing, the Commission found justification for its broad exemption in the cost of rate publication, the delay necessitated by the provision that rates take effect only after thirty days, and the inhibition of innovative price/service options. We scrutinize each justification in turn.
 
 
 122
 a. Cost
 
 
 123
 The Commission found as a fact that "eliminating the preparation and filing of tariffs will result in substantial cost savings" which may be passed on to consumers in the form of lower prices for goods and services.[156] The principal direct savings inure to the exempted contract carriers. One large carrier estimated that the cost of preparing and publishing rate schedules totalled over $40,000 annually.[157] The Commission recognized that "[f]or smaller, less profitable carriers ... the expense of continued tariff filing could be prohibitive."[158] Savings should also be realized by the agency. According to concurring Commissioner Andre: "More than 66,000 contract tariffs were filed last year.... If the total cost per tariff [to the private and public sectors] is no more than $500, then tens of millions are expended annually on paperwork alone."[159]
 
 
 124
 Petitioners have a point when they observe that these costs are not a large percentage of gross revenues or even of profit for most carriers.[160] What this analysis ignores, however, is that the benefits of policy change must be weighed against the costs. Even a small cost is sufficient to justify regulatory change if the benefits of existing regulation are nonexistent. That is the essence of the Commission's judgment here,[161] and we find ample record evidence to support it.[162]
 
 
 125
 b. Delay
 
 
 126
 The Commission concluded that exemption from tariff filing will give contract carriers "the enhanced flexibility to respond quickly to market signals."[163] As it now stands, contract carriers must languish thirty days after filing a tariff before the new rate can go into effect.[164]
 
 
 127
 It is an incomplete answer to say that the Commission may allow tariffs to become effective on short notice. The existing short notice provision is available only "if cause exists in particular instances or ... [in] special circumstances."[165] The Commission by regulation interprets this phrase to mean "actual emergency and real merit."[166] If there is doubt as to the meaning of this latter phrase, the very next sentence provides that "[c]ommercial competition or the desire to meet the rates of a competing carrier that has given statutory notice for reduced rates or for the establishment of new rates and charges will not of itself be regarded as cause for permitting changes in rates or other provision on less than statutory notice."[167] Of course, the Commission could propose an across-the-board reduction in the notice period, but the agency explicitly considered that and similar approaches and was "not persuaded that the alternatives which have been suggested offer any substantial benefit to the public since each proposal would still entail significant paperwork and delay. This would thwart the shippers' need for immediate service and carriers' needs to compete in a changing marketplace."[168] We find sufficient record evidence to support the Commission's findings.[169]
 
 
 128
 c. Inhibition of innovative price/service options
 
 
 129
 As a final benefit, the Commission posits that the exemption will allow contract carriers "to tailor their service and price options to the individual and varying needs of their contract shippers."[170]
 
 
 130
 Petitioners argue that "service and price options" is an empty phrase. This accusation overlooks the Commission's example of "innovative pricing techniques," admittedly provided in the agency's discussion of household goods transport, of "service based on binding written estimates rather than actual weights and tariff rates."[171] In the current environment each experiment carries with it the need to prepare a tariff and wait thirty days before carrying it out. The Commission's expectation of innovation upon removal of these restrictions is eminently sensible. Absent any specific refutation by petitioners, we accept the agency's expert judgment.
 
 
 131
 3. The request for continued application of tariff-filing requirements to contract carriers of household goods
 
 
 132
 Petitioner Household Goods Carriers' Bureau, Inc. asserts that the Commission's decision to exempt household goods carriers from the tariff-filing requirements contravenes the Household Goods Transportation Act of 1980.[172] It contends that exemption leaves unsophisticated consumers negotiating shipment of a lifetime's possessions at the mercy of unscrupulous carriers. According to the Bureau, Congress recognized that individual consumers, due to the infrequent and episodic nature of their shipping needs and the extraordinary subjective value of household belongings, are easy prey for dishonest carriers.[173]
 
 
 133
 The Household Goods Transportation Act of 1980 defines three categories of "household goods." Roughly stated, these three categories consist of household belongings ("first proviso" goods),[174] business fixtures and furnishings ("second proviso" goods),[175] and articles requiring delicate means of transport ("third proviso" goods).[176]
 
 
 134
 The Commission's rationale for including contract carriers of household goods in its broad exemption--although perfectly valid at the time of the Commission's decision--has been overtaken by events. During this court's deliberations, the Commission adopted a "policy statement" permitting contract carriers to serve an industry or industries as a class.[177] Under this decision, contract carriers might conceivably serve the entire "household goods carriage industry." Moreover, because these carriers are contract carriers, they would be exempt from tariff-filing requirements pursuant to the Commission's decision challenged here. Candidly, the Commission concedes that "broad contract authority would have an impact on the Commission's ability to enforce consumer protection regulation."[178]
 
 
 135
 Although changes in material circumstances ordinarily call for vacating an agency's decision and remanding for reconsideration, that time-honored procedure is not appropriate for this petition. Remanding to the agency will not promote respect for the agency as "primary decisionmaker,"[179] because the Commission's industrywide service decision already contains a full discussion of the ramifications of that decision for enforcement of consumer protection regulations.[180] Nor will failure to remand prejudice petitioner Household Goods Carriers' Bureau; it was a party to the Commission's industry-wide service decision as well as the tariff-exemption reviewed here.[181] Indeed, petitioner's brief in this case anticipated the Commission's industry-wide service decision.[182] Not surprisingly, our reading of the Commission's published industry-wide service decision reveals a close resemblance between petitioner's arguments in that case and its contentions herein.
 
 
 136
 Without passing on the merits of any challenge to the Commission's industry-wide service decision, and relying solely on the points and authorities contained in the record before us, we hold that the Commission's exemption of household goods contract carriers from tariff-filing requirements is not contrary to law. The Commission's exemption does not strip individual shippers of household belongings of protections mandated by the Household Goods Transportation Act.
 
 
 137
 As a factual matter, the consumers that the new law was most concerned about--unsophisticated individual shippers who ship household goods only occasionally--do not negotiate rates and service directly with contract carriers. By statutory definition, contract carriage involves "continuing agreements"[183]; individual shippers of household goods do not maintain ongoing contractual obligations for carriage of their household goods. According to the Commission, this requirement is not relaxed now that contract carriers have authority to render service to an entire industry: "We emphasize, however, that we do not propose to authorize indiscriminate service to any shipper within a class. Rather, shippers in the class must actually enter into continuing contracts with the carrier."[184] Thus, individual shippers should be unaffected by the Commission's exemption. Corporate and government shippers, who deal with contract carriers of household goods on behalf of their employees, do not need the protections Congress designed for "consumer shippers."
 
 
 138
 The Commission's regulations bear out this distinction between consumer and corporate/government shippers of household goods. The requirements relating to written estimates, notification of charges, advertising, and so forth apply only to "first proviso" goods--the personal belongings one might expect consumers to ship themselves. "Second and third proviso" goods--the business fixtures and furnishings and articles requiring delicate means of transport one would expect corporations and governments to ship--are explicitly exempted from the Commission's regulation.[185] In the Commission's words,
 
 
 139
 grants of contract authority for household goods carriers have been historically limited to commercial accounts ... These authorizations normally would only involve movements of "second and third proviso" household goods. As such, the regulations ... which protect individual shippers of "first proviso" household goods, would not apply.[186]
 
 
 140
 In sum, "household goods" shipped under contract turn out to consist almost entirely of goods shipped by businesses and governments. Household items ordinarily shipped by unsophisticated consumers are shipped by common carrier. Even after the Commission's exemption and decision to authorize industry-wide service, these latter goods remain fully subject to the Commission's consumer protection regulations. And of course, petitioners may challenge the bona fides of any contract carrier serving individual consumer shippers in contravention of the 1980 Act.[187]
 
 VI. CONCLUSION
 
 141
 According the tariff-filing exemptions the scope suggested by the facial breadth of their terms--and interpreting them in light of the recently amended national transportation policy, which seeks to promote competition and prune unnecessary federal regulation and which is incorporated in the exemption provisions by reference--we affirm the Interstate Commerce Commission's decision to relieve all motor contract carriers of property from the requirement to file tariffs. The Commission's order is
 
 
 142
 Affirmed.
 
 
 
 *
 Senior Circuit Judge Wilkey did not participate in the decision of this case
 
 
 [1]
 See 49 U.S.C. Secs. 10101-11917 (1982)
 
 
 [2]
 See id. Secs. 10702(b), 10761(a), 10762(a)(1)
 
 
 [3]
 Id. Sec. 10102(14)(B)
 
 
 [4]
 Id. Sec. 10102(13)
 
 
 [5]
 Id. Secs. 10702(b), 10761(b), 10762(f)
 
 
 [6]
 See Petition of Armored Carrier Corp. for Relief from the Provisions of Section 218(a) of the Interstate Commerce Act, 303 I.C.C. 781 (1958); Transportation of United States Gov't Freight by Contract Carriers by Motor Vehicle, 301 I.C.C. 551 (1957); Baggett Transp. Co.--Petition for Exemption--Transp. for United States Gov't, 61 M.C.C. 771 (1953)
 
 
 [7]
 See, e.g., Johnsrud Transp., Inc.--Petition for Exemption from Tariff Filing Requirements (served 20 May 1983) (No. 38,959), reprinted in Joint Deferred App. (JDA) at 433; Riverside Transp., Inc.--Petition for Exemption from Tariff Filing Requirements (served 20 May 1983) (No. 38,909), reprinted in JDA at 393; Batt Trucking--Petition for Exemption from Tariff Filing Requirements (served 12 May 1983) (No. 38,990-7), reprinted in JDA at 496; Aero Mayflower Transit Co., Inc.--Petition for Exemption from Tariff Filing Requirements (served 6 May 1983) (No. 38,879), reprinted in JDA at 780; Allied Van Lines, Inc.--Petition for Exemption from Tariff Filing Requirements (served 29 Apr. 1983) (No. 38,998), reprinted in JDA at 775; Three Way Corp., Petition for Exemption from Tariff Filing Requirements (served 13 Jan. 1983, modified 30 Mar. 1983) (No. 38,828), reprinted in JDA at 769, 773; Ward Transport, Inc.--Petition for Exemption from Tariff Filing Requirements (served 7 Jan. 1983) (No. 38-856), reprinted in JDA at 765; UTF Carriers, Inc.--Petition for Exemption from Tariff Filing Requirements under 49 U.S.C. 10761(b) (served 12 Oct. 1982) (No. 38,749), reprinted in JDA at 759; Gray Moving & Storage, Inc., Petition for Exemption from Tariff Filing Requirements (served 29 Apr. 1982) (No. 38,704), reprinted in JDA at 757; Gray Moving & Storage, Inc., Petition from Tariff Filing Requirements (served 5 Nov. 1981) (No. 38,703), reprinted in Joint Brief of Intervenors in Support of Respondents, at 43 app. A, No. 83-1761
 
 
 [8]
 See JDA at 1
 
 
 [9]
 See id. at 40
 
 
 [10]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 47 Fed.Reg. 57,303 (1982) (notice of proposed rulemaking). Although the Commission found that it could begin a proceeding neither on its own initiative nor at the request of the FTC, it concluded that the Contract Carrier Conference was qualified to apply for class-wide relief. See id. at 57,304
 
 
 [11]
 See id. at 57,303
 
 
 [12]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150 (1983) (Ex Parte No. MC-165)
 
 
 [13]
 See id. at 152
 
 
 [14]
 See Central & Southern Motor Freight Tariff Ass'n, Inc. v. United States, No. 83-1581 (D.C.Cir. filed 3 June 1983)
 
 
 [15]
 See Household Goods Carriers' Bureau, Inc. v. United States, No. 83-1740 (D.C.Cir. filed 8 July 1983)
 
 
 [16]
 See UTF Carriers, Inc.--Petition for Exemption from Tariff Filing Requirements under 49 U.S.C. 10761(b) (served 12 Oct. 1982) (No. 38,749), reprinted in JDA at 759
 
 
 [17]
 See Joint Brief for Petitioners and Intervening Petitioners at 11, Nos. 83-1581, 83-1761 & 83-1973
 
 
 [18]
 See, e.g., Motor Carriers; UTF Carriers, Inc.--Petition for Exemption from Filing Requirements, 48 Fed.Reg. 22,376, 22,376 (1983) (No. 38,749 (Sub-No. 1)) (consolidating 5 petitions); International Transport, Inc., et al.--Petition for Exemption from Tariff Filing Requirements, 47 Fed.Reg. 55,537, 55,538 (1982) (No. 38,895) (consolidating 23 petitions); Motor Carriers; RTC Trans., Inc.; Decision on Petition for Relief from Tariff Filing Requirements, 47 Fed.Reg. 49,100, 49,100 (1982) (No. 38,887); Gray Moving & Storage Inc., Petition for Exemption from Tariff Filing Requirements, 46 Fed.Reg. 36,76 3, 36,764 (1981) (No. 38,649)
 
 
 [19]
 See In re: Eastern Central Motor Carriers Association, Inc. and Regular Common Carrier Conference, Inc.--Petition for Writ of Mandamus and Writ of Prohibition, No. 83-1386 (D.C.Cir. filed 12 Apr. 1983)
 
 
 [20]
 See In re: Eastern Central Motor Carriers Association, Inc. and Regular Common Carrier Conference, Inc.--Petition for Writ of Mandamus and Writ of Prohibition, No. 83-1386 (D.C.Cir. 10 June 1983)
 
 
 [21]
 See UTF Carriers, Inc.,--Petition for Exemption from Tariff Filing Requirements (served 5 July 1983) (No. 38,749 (Sub-No. 1)) (addressing cases not yet beyond the provisional exemption stage), reprinted in JDA at 298; International Transport, Inc.--Petition for Exemption from Tariff Filing Requirements (served 5 July 1983) (No. 38,895) (addressing cases in which requests for administrative reconsideration of final grants of relief had been received), reprinted in JDA at 733
 
 
 [22]
 See Eastern Central Motor Carriers Ass'n, Inc. v. United States, No. 83-1761 (D.C.Cir. filed 14 July 1983)
 
 
 [23]
 We granted an administrative stay on 30 June 1983 to give ourselves the opportunity to consider petitioners' request to stay the broad exemption, which was scheduled to go into effect on that date
 
 
 [24]
 Central & Southern Motor Freight Tariff Ass'n, Inc. v. United States, Nos. 83-1581 & 83-1761 (D.C.Cir. 29 July 1983)
 
 
 [25]
 See id. at 2
 
 
 [26]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 48 Fed.Reg. 40,520 (1983) (Ex Parte No. MC-165) (rule related notice; notice of court action)
 
 
 [27]
 See Eastern Central Motor Carriers Ass'n, Inc. v. United States, No. 83-1973 (D.C.Cir. filed 12 & 13 Sept. 1983)
 
 
 [28]
 See Eastern Central Motor Carriers Ass'n, Inc. v. United States, No. 83-1973 (D.C.Cir. 14 Sept. 1983)
 
 
 [29]
 See Eastern Central Motor Carriers Ass'n, Inc. v. United States, No. 83-1973 (D.C.Cir. 23 Sept. 1983)
 
 
 [30]
 See Central & Southern Motor Freight Tariff Ass'n, Inc. v. United States, Nos. 83-1581, 83-1740 & 83-1973 (D.C.Cir. 28 Sept. 1983)
 
 
 [31]
 See id. Petitioners' requests for further reconsideration were denied
 
 
 [32]
 The parties recognize this fact as well. See Joint Brief for the Interstate Commerce Commission and the United States of America at 50, Nos. 83-1581, 83-1740, 83-1761 & 83-1973; Brief for Intervening Respondent, International Transport, Inc. at 30, Nos. 83-1581, 83-1761 & 83-1973; Joint Reply Brief for Petitioners and Intervening Petitioners at 30, Nos. 83-1581, 83-1761 & 83-1973
 
 
 [33]
 Motor Carrier Act, 1935, ch. 498, 49 Stat. 543 (codified as amended and with some differences in language but without substantive change at scattered sections of 49 U.S.C.). The Motor Carrier Act of 1935 was codified as title II of the Transportation Act of 1940. See Transportation Act of 1940, ch. 722, 54 Stat. 898, 929-52
 
 
 [34]
 See Contracts of Contract Carriers, 1 M.C.C. 628, 631 (1937), modified, Contracts of Contract Carriers, 11 M.C.C. 693 (1938), modified sub nom. In re Filing of Contracts by Contract Carriers by Motor Vehicle, 41 M.C.C. 527 (1942)
 
 
 [35]
 See Motor Carrier Act, 1935, Secs. 203(15), 210, 49 Stat. 543, 544, 554 (repealed 1980)
 
 
 [36]
 See Contracts of Contract Carriers, 1 M.C.C. at 632
 
 
 [37]
 See Motor Carrier Act, 1935, Sec. 218(a), 49 Stat. at 561 (codified as amended and with some differences in language but without substantive change at 49 U.S.C. Secs. 10702(b), 10761(a), 10762(a)(1) (1982))
 
 
 [38]
 See id. Sec. 218(a), 49 Stat. at 562 (codified with some differences in language but without substantive change at 49 U.S.C. Secs. 10702(b), 10761(b), 10762(f))
 
 
 [39]
 See Act of 13 Aug. 1957, Pub.L. No. 85-124, 71 Stat. 343 (codified as amended at 49 U.S.C. Secs. 10702, 10761, 10762)
 
 
 [40]
 H.R.REP. NO. 895, 85th Cong., 1st Sess. 2, reprinted in 1957 U.S. CODE CONG. & AD.NEWS 1406, 1407; accord, S.REP. NO. 335, 85th Cong., 1st Sess. 2 (1957)
 
 
 [41]
 See Act of 13 Aug. 1957, Pub.L. No. 85-124, 71 Stat. 343, 343 (codified at 49 U.S.C. Secs. 10702(b), 10761(a), 10762(a)(1) (1982))
 
 
 [42]
 H.R.REP. NO. 895, 85th Cong., 1st Sess. 2, reprinted in 1957 U.S.CODE CONG. & AD.NEWS 1406, 1407
 
 
 [43]
 Id., reprinted in 1957 U.S.CODE CONG. & AD.NEWS at 1407; see also id. ("[I]t is more difficult for common carriers to compete since they have no way of knowing the actual rates charged by their contract carrier competitors."), reprinted in 1957 U.S.CODE CONG. & AD.NEWS at 1407
 
 
 [44]
 The disparate regulatory treatment of contract and common carriers is perhaps best illustrated by example. In many instances the amended Motor Carrier Act placed contract carriers at a distinct disadvantage. For example, common carriers could typically initiate new service to shippers without delay, while contract carriers had to apply for a permit to serve each new customer. See 49 U.S.C. Sec. 10761(a) (1982)
 Common carriers were not completely sacrosanct, however. While the rates of contract carriers could be attacked and set aside only for being unreasonably low (and thus harmful to competing carriers), common carrier rates could be attacked and set aside for being unreasonably high (and thus harmful to shippers). See id. Sec. 10708(a)(1). In addition, contract carriers could raise their rates without prior warning, while common carriers could increase their rates only upon thirty days advance notice. See id. Sec. 10762(c)(1)-(2). Furthermore, common carrier rates could be set aside for discriminating unjustly between shippers; contract carrier rates could not. See id. Sec. 10741.
 Petitioners assert that "courts have recognized the importance Congress placed on achieving competitive equality for common carriers through the 1957 amendment." Joint Brief for Petitioners and Intervening Petitioners at 27, Nos. 83-1581, 83-1761 & 83-1973. Although the cases cited by petitioners prove that the 1957 legislation was designed to protect common carriers from contract carrier competition, see Locust Cartage Co. v. Transamerican Freight Lines, Inc., 430 F.2d 334, 343 (1st Cir.) (published rates prevent "destructive competition"), cert. denied, 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970); Bowser & Campbell v. Knox Glass, Inc., 390 F.2d 193, 195-96 (3d Cir.), cert. denied, 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365 (1968); but see A & F Trucking Corp. v. Liggett Drug Co., 253 F.Supp. 699, 702 (S.D.N.Y.1966) (mistakenly reading the House and Senate Committee reports as mandating "equaliz[ation of] competitive opportunities"), they do not prove that "competitive equality" lies at the heart of the 1957 amendment. The numerous restrictions imposed on contract carriers besides the tariff-filing requirements are inconsistent with petitioners' "competitive equality" characterization.
 
 
 [45]
 See Liberty Trucking Co., Extension--General Commodities, 130 M.C.C. 243, 246-47 (1978), aff'd, 131 M.C.C. 573, 574-75 (1979), aff'd sub nom. Assure Competitive Transp., Inc. v. United States, 629 F.2d 467, 475-79 (7th Cir.1980), cert. denied, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981); see also Policy Statement on Motor Carrier Regulation, 44 Fed.Reg. 60,296 (1979) (Ex Parte No. MC-121) (reducing importance of adequacy of existing service), aff'd sub nom. Assure Competitive Transp., Inc. v. United States, 635 F.2d 1301, 1304-07 (7th Cir.1980)
 
 
 [46]
 See, e.g., Cargo Contract Carrier Corp. Extension--Bananas, 126 M.C.C. 874, 880 (1977)
 
 
 [47]
 See Dual Operations of Motor Carriers, 43 Fed.Reg. 14,664 (1978) (Ex Parte No. MC-55 (Sub-No. 27)), aff'd sub nom. American Trucking Ass'ns, Inc. v. United States, 602 F.2d 444, 449-52 (D.C.Cir.), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979)
 
 
 [48]
 See Policy Statement Regarding the "Rule of Eight" in Contract Carrier Applications, 44 Fed.Reg. 2470 (1979) (Ex Parte No. MC-119), petition for review dismissed as not ripe sub nom. Regular Common Carrier Conference v. United States, 628 F.2d 248, 251-52 (D.C.Cir.1980)
 
 
 [49]
 See H.R.REP. NO. 1069, 96th Cong., 2d Sess. 1, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 2283, 2283
 
 
 [50]
 Motor Carrier Act of 1980, Pub.L. No. 96-296, Sec. 3(a), 94 Stat. 793, 793 (codified at 49 U.S.C. Sec. 1010 note (1982))
 
 
 [51]
 See H.R.REP. NO. 1069, 96th Cong., 2d Sess. 13, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 2283, 2295
 
 
 [52]
 See Motor Carrier Act of 1980, Pub.L. No. 96-296, Sec. 2, 94 Stat. 793, 793 (codified at 49 U.S.C. Sec. 10101 note (1982)) ("This Act is part of the continuing effort by Congress to reduce unnecessary regulation by the Federal Government.")
 
 
 [53]
 H.R.REP. NO. 1069, 96th Cong., 2d Sess. 22, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 2283, 2304
 
 
 [54]
 49 U.S.C. Sec. 10101(a)(2) (1982); see Motor Carrier Act of 1980, Pub.L. No. 96-296, Sec. 3(a), 94 Stat. 793, 793 (codified at 49 U.S.C. Sec. 10101 note (1982)); H.R.REP. NO. 1069, 96th Cong., 2d Sess. 3 ("The legislation establishes a new Federal policy which is to promote a competitive and efficient motor carrier industry...."), reprinted in 1980 U.S.CODE CONG. & AD.NEWS 2283, 2285
 
 
 [55]
 See Motor Carrier Act of 1980, Pub.L. No. 96-296, Sec. 10(b), 94 Stat. 793, 800 (codified at 49 U.S.C. Sec. 10930(a) (1982))
 
 
 [56]
 See id. Sec. 10(a)(1), 94 Stat. at 799-800
 
 
 [57]
 See id. Sec. 10(a)(3), 94 Stat. at 800 (codified at 49 U.S.C. Sec. 10923(d)(1))
 
 
 [58]
 See id. Sec. 10(c)-(d), 94 Stat. at 800-801 (codified at 49 U.S.C. Secs. 10749(a)-(b)(1), 10766(b))
 
 
 [59]
 See id. Sec. 34(b), 94 Stat. at 825 (codified at 49 U.S.C. Sec. 10923(e))
 
 
 [60]
 See H.R.REP. NO. 1069, 96th Cong., 2d Sess. 22-23, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 2283, 2304-05
 The Commission now allows contract carriers to serve entire industries. See Motor Contract Carriers of Property--Proposal to Allow Issuance of Permits Authorizing Industry-Wide Services, 133 M.C.C. 298, 303 (served 28 Dec. 1983) (Ex Parte No. MC-165 (Sub-No. 1)), petition for review dismissed as not ripe sub nom. American Trucking Ass'ns, Inc. v. Interstate Commerce Comm'n, 747 F.2d 787 (D.C.Cir.1984).
 
 
 [61]
 Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit
 Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); see Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).
 
 
 [62]
 Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) (emphasis added and citations omitted)
 One respondent also argues that petitioner Eastern Central Motor Carriers Association, Inc. cannot maintain this petition consistent with the provisions of law enabling its establishment as a tariff bureau that would otherwise violate the antitrust laws. See 49 U.S.C. Sec. 10706(b)(2) (1982) (antitrust immunity for certain Commission-approved rate agreements); 49 U.S.C. Sec. 10706(b)(3)(B)(iii) (tariff bureau may not file a protest against any tariff item published by a motor carrier); Joint Brief of Intervenors Schneider Transport, Inc., R.C. Service, Inc., Distribution Service System, Inc., Warren Transport, Inc., and CECO Transport, Inc. in Support of Respondents at 21-22, Nos. 83-1581, 83-1761 & 83-1973. It may well be that, even if respondent's reading of Sec. 10706 is correct, its appropriate course would be to seek Commission action under that section, see 49 U.S.C. Sec. 10706(f)-(h) (authority to review, modify and terminate antitrust immunity), rather than dismissal of Eastern's petition or adjudication of Eastern's antitrust liability in this proceeding. We need not reach that point, however, since even if Eastern is not competent to challenge the Commission's decision, several other petitioners most certainly are.
 
 
 [63]
 49 U.S.C. Secs. 10702(b), 10761(b), 10762(f)
 
 
 [64]
 Motor Carrier Act, 1935, ch. 498, Sec. 218(a), 49 Stat. 543, 562 (codified with some differences in language but without substantive change at 49 U.S.C. Secs. 10702(b), 10761(b), 10762(f)) (emphasis added)
 
 
 [65]
 See Act of 17 Oct. 1978, Pub.L. No. 95-473, Sec. 3(a), 92 Stat. 1337, 1466; H.R.REP. NO. 1395, 95th Cong., 2d Sess. 9, reprinted in 1978 U.S.CODE CONG. & AD.NEWS 3009, 3018
 
 
 [66]
 5 U.S.C. Secs. 551, 553-559, 701-706, 1305, 3105, 3344, 5372, 7521 (1982)
 
 
 [67]
 See United States v. Florida East Coast Ry. Co., 410 U.S. 224, 237-38, 240, 93 S.Ct. 810, 817, 818, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 756-57, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453 (1972)
 
 
 [68]
 See United States v. Florida East Coast Ry. Co., 410 U.S. at 237-38, 240, 93 S.Ct. at 817, 818
 
 
 [69]
 See NAACP v. Federal Power Comm'n, 425 U.S. 662, 668-69, 96 S.Ct. 1806, 1810-11, 48 L.Ed.2d 284 (1976); National Labor Relations Bd. v. Bell Aerospace Co., 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); Securities & Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) ("[T]he choice between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." (citation omitted)); Independent U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908, 917 (D.C.Cir.1982); Trans-Pacific Freight Conference v. Federal Maritime Comm'n, 650 F.2d 1235, 1244 (D.C.Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981)
 
 
 [70]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 166 (1983) (Ex Parte No. MC-165) (Andre, Comm'r, concurring) ("However, that process [continued individual exemptions] would necessarily involve a high cost in terms of legal and administrative fees. A blanket exemption will reduce these costs substantially, with the advantage that the remaining contract carriers will receive relief simultaneously."); cf. Federal Power Comm'n v. Texaco, Inc., 377 U.S. 33, 44, 84 S.Ct. 1105, 1112, 12 L.Ed.2d 112 (1964) ("There would be a vast proliferation of hearings ... We see no reason why under this statutory scheme the processes of regulation need be so prolonged and so crippled." (citations and footnote omitted))
 
 
 [71]
 See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543-48, 98 S.Ct. 1197, 1211-14, 55 L.Ed.2d 460 (1978)
 
 
 [72]
 Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); accord, Aero Mayflower Transit Co. v. Interstate Commerce Comm'n, 686 F.2d 1, 5-6 (D.C.Cir.1982)
 
 
 [73]
 --- U.S. ----, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)
 
 
 [74]
 Id. at 2782 (footnote omitted)
 
 
 [75]
 Id. (footnote omitted); accord, Railway Labor Executives' Ass'n v. United States R.R. Retirement Bd., 749 F.2d 856, 860 (D.C.Cir.1984); American Methyl Corp. v. Environmental Protection Agency, 749 F.2d 826, 833 (D.C.Cir.1984); State of Montana v. Clark, 749 F.2d 740, 744-746 (D.C.Cir.1984); Rettig v. Pension Benefit Guaranty Corp., 744 F.2d 133, 140-41 (D.C.Cir.1984); General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1566-67 (D.C.Cir.1984) (en banc); see Federal Election Comm'n v. Democratic Senatorial Campaign Comm'n, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); Environmental Protection Agency v. National Crushed Stone Ass'n, 449 U.S. 64, 83-84, 101 S.Ct. 295, 306-307, 66 L.Ed.2d 268 (1980); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Illinois Commerce Comm'n v. Interstate Commerce Comm'n, 749 F.2d 875, 880 (D.C.Cir.1984); Indiana & Mich. Mun. Distribs. Ass'n v. Federal Energy Regulatory Comm'n, 659 F.2d 1193, 1196 (D.C.Cir.1981)
 
 
 [76]
 49 U.S.C. Secs. 10702(b), 10761(b), 10762(f) (1982)
 
 
 [77]
 Motor Carrier Act, 1935, ch. 498, Sec. 218(a), 49 Stat. 543, 562 (emphasis added)
 
 
 [78]
 Central Forwarding, Inc. v. Interstate Commerce Comm'n, 698 F.2d 1266, 1284 (5th Cir.1983) (quotation marks omitted)
 
 
 [79]
 Joint Brief for Petitioners and Intervening Petitioners at 22, Nos. 83-1581, 83-1761 & 83-1973
 
 
 [80]
 The legislative history of the Motor Carrier Act of 1935 likewise denies that the exemption power is narrow. Senator Wheeler, floor manager of the bill that became the 1935 Act, remarked that "[t]he Commission is authorized ... to grant relief from the provisions of this paragraph. This section is so worded as to permit of suitable flexibility and relief of operators from any requirements which may be unduly burdensome and not productive of any good result." 79 CONG.REC. 5656 (1935)
 
 
 [81]
 See Greyhound Corp. v. Mt. Hood Stages, Inc., 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)); National Ass'n of Recycling Indus. v. Interstate Commerce Comm'n, 660 F.2d 795, 799 (D.C.Cir.1981) (citing Lewis v. United States, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980)); March v. United States, 506 F.2d 1306, 1313 (D.C.Cir.1974))
 
 
 [82]
 656 F.2d 1115 (5th Cir.1981)
 
 
 [83]
 See id. at 1125-27
 
 
 [84]
 See 49 U.S.C. Sec. 10505(a) (1982). The rail transportation policy is set forth at id. Sec. 10101a
 
 
 [85]
 602 F.2d 444 (D.C.Cir.), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979)
 
 
 [86]
 See id. at 451-52
 
 
 [87]
 Motor Carrier Act, 1935, ch. 498, Sec. 210, 49 Stat. 543, 554 (repealed 1980)
 
 
 [88]
 602 F.2d at 449-50 (footnote omitted)
 
 
 [89]
 National Small Shipments Traffic Conference, Inc. v. Civil Aeronautics Bd., 618 F.2d 819, 827 (D.C.Cir.1980) (quoting Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) (in turn quoting Commissioner v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965)); see id. at 827-28
 
 
 [90]
 See id. at 827-31
 
 
 [91]
 Act of 9 Nov. 1977, Pub.L. No. 95-163, Sec. 17(a), 91 Stat. 1278, 1285, repealed by Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705
 
 
 [92]
 For example, petitioners attempt to distinguish the Fifth Circuit's decision in American Trucking Associations by stating that Congress charged the Commission to deregulate rail carriers but not motor carriers. This is difficult to square with section 2 of the Motor Carrier Act of 1980, which states that "[t]his Act is part of the continuing effort by Congress to reduce unnecessary regulation by the Federal Government." 49 U.S.C. Sec. 10101 note (1982). It is also at odds with the amended national transportation policy, which is now aimed at "promot[ing] competitive and efficient transportation services." Id. Sec. 10101(a)(2)
 Petitioners also note that the Commission's power to exempt motor carriers is permissive, see id. Secs. 10702(b), 10761(b), 10762(f) ("may"), while its power to exempt railroads is mandatory, see id. Sec. 10505(a) ("shall"). Although the Commission has less discretion in the latter case than in the former, its power to exempt is the same in both cases. The language difference goes only to when the Commission's power is to be exercised, not to the scope of the power itself.
 
 
 [93]
 Joint Brief for Petitioners and Intervening Petitioners at 22, Nos. 83-1581, 83-1761 & 83-1973
 
 
 [94]
 See Alabama Power Co. v. Costle, 636 F.2d 323, 357-61 (D.C.Cir.1979) and cases cited therein
 Although the agency also pointed to an express exemption provision in Alabama Power Co., the provision authorized only limited exemptions--and we did not purport to construe it narrowly. As it turned out, the agency "concede[d] that its exemption ... [was] an 'expansion' of the limited exemption provided" by Congress which was not "consistent with the statutory language of the Clean Air Act." Id. at 356. We accordingly held that "EPA's 'expansion' of the ... [statutory] exemption falls well beyond the agency's [express] exemption authority." Id.
 
 
 [95]
 Advanced Micro Devices v. Civil Aeronautics Bd., 742 F.2d 1520, 1541-42 (D.C.Cir.1984) (citing Easterbrook, Statutes' Domains, 50 U. CHI.L.REV. 533, 537-39 (1983)). For an example of the difficulties posed, see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 2867-68, 77 L.Ed.2d 443 (1983)
 
 
 [96]
 The Motor Carrier Act of 1957 also left the exemption power intact. Indeed, the legislative history of the 1957 legislation recognized the continuing vitality of that provision. See S.REP. NO. 335, 85th Cong., 1st Sess. 4 (1957)
 
 
 [97]
 S.REP. NO. 641, 96th Cong., 2d Sess. 4 (1980). Although Congress did not adopt the Senate bill, there is no evidence of disagreement on this point
 
 
 [98]
 See Ryder Truck Lines, Inc. v. United States, 716 F.2d 1369, 1381-85 (11th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1707, 80 L.Ed.2d 181 (1984). Petitioners attempt to distinguish Ryder on the ground that the court in that case deferred review until such time as the Commission's policy change is applied in individual cases. In point of fact, the court did not defer decision; it merely stated that it would be on the look-out for attempts to circumvent the Commission's policy when individual adjudications come up for judicial review. See id. at 1386
 
 
 [99]
 49 U.S.C. Secs. 10702(b), 10761(b), 10762(f) (1982)
 
 
 [100]
 H.R.REP. NO. 1069, 96th Cong., 2d Sess. 11-12, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 2283, 2293-94
 
 
 [101]
 49 U.S.C. Sec. 10101(a)(2) (1982)
 
 
 [102]
 H.R.REP. NO. 1069, 96th Cong., 2d Sess. 3, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 2283, 2285
 
 
 [103]
 Id. at 12, reprinted in 1980 U.S.CODE CONG. & AD.NEWS at 2294
 
 
 [104]
 Petitioners quote the following language from Congress's findings to support their view that the legislature intended to keep the Commission on a tight rein: "[T]he Interstate Commerce Commission should not attempt to go beyond the powers vested in it by the Interstate Commerce Act and other legislation enacted by Congress." 49 U.S.C. Sec. 10101 note (1982). Petitioners' point, however, begs the question whether the Commission has in fact exceeded its statutory authority. As explained in text, we conclude that it has not
 
 
 [105]
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 158 (1983) (Ex Parte No. MC-165) (footnote omitted)
 In an additional argument claiming legislative adoption by implication, petitioners intimate that Congress codified the Commission's representation before this court in American Trucking Ass'ns, Inc. v. United States, 602 F.2d 444 (D.C.Cir.), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979), that the agency would use the tariff-filing requirements to monitor and control dual common/contract authority rate abuses, see id. at 451. Petitioners cite no evidence by which congressional adoption of this litigation position can be said to have occurred.
 
 
 [106]
 49 U.S.C. Secs. 10702(b), 10761(b), 10762(f) (1982). Actually, the original provision referred to "any class or group" of contract carriers. See Motor Carrier Act, 1935, ch. 498, Sec. 218(a), 49 Stat. 543, 562. When the provision was recodified, "[t]he word 'group' [was] substituted for 'any class or group' as being more inclusive." H.R.REP. NO. 1395, 95th Cong., 2d Sess. 69, reprinted in 1978 U.S.CODE CONG. & AD.NEWS 3009, 3078. Since "class" relief may encompass the entire class of motor contract carriers, "group" relief (which must be "more inclusive" than "class" relief, according to the recodifiers) may similarly extend to all motor contract carriers
 
 
 [107]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 152 (1983) (Ex Parte No. MC-165)
 
 
 [108]
 See United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-20, 99 L.Ed. 615 (1955); In re Surface Mining Regulation Litig., 627 F.2d 1346, 1362 (D.C.Cir.1980); Motor & Equip. Manufs, Ass'n, Inc. v. Environmental Protection Agency, 627 F.2d 1095, 1107-08 (D.C.Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980); 2A J. SUTHERLAND, STATUTORY CONSTRUCTION Sec. 46.06, at 107 (N. Singer rev. C. Sands 4th ed. 1984)
 
 
 [109]
 See 49 U.S.C. Secs. 10704(a)(1), (c)(1), (f), 10708(a)(1) (1982)
 
 
 [110]
 See id. Secs. 10704(f), 10708(f)
 
 
 [111]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 152 (1983) (Ex Parte No. MC-165)
 
 
 [112]
 See Petition of Armored Carrier Corp. for Relief from the Provisions of Section 218(a) of the Interstate Commerce Act, 303 I.C.C. 781 (1958); Transportation of United States Gov't Freight by Contract Carriers by Motor Vehicle, 301 I.C.C. 551 (1957); Baggett Transp. Co.--Petition for Exemption --Transp. for United States Gov't, 61 M.C.C. 771 (1953)
 
 
 [113]
 See Motor Vehicle Manufs. Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); Advanced Micro Devices v. Civil Aeronautics Bd., 742 F.2d 1520, 1542 (D.C.Cir.1984); Wheaton Van Lines, Inc. v. Interstate Commerce Comm'n, 671 F.2d 520, 527 (D.C.Cir.1982); Greater Boston Television Corp. v. Federal Communications Comm'n, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)
 
 
 [114]
 Petition of Armored Carrier Corp. for Relief from the Provisions of Section 218(a) of the Interstate Commerce Act, 303 I.C.C. 781
 
 
 [115]
 See id. at 782-84, 788
 
 
 [116]
 See Petition of Armored Carrier Corp. for Relief from the Provisions of Section 218(a) of the Interstate Commerce Act, 303 I.C.C. at 788; Transportation of United States Gov't Freight by Contract Carriers by Motor Vehicle, 301 I.C.C. at 556; Baggett Transp. Co.--Petition for Exemption --Transp. for United States Gov't, 61 M.C.C. at 781. The Baggett decision is even less apposite. The "principal" issue in that case was whether the contract- and tariff-filing requirements even applied to government traffic. See Baggett Transp. Co.--Petition for Exemption --Transp. for United States Gov't, 61 M.C.C. at 773-81
 
 
 [117]
 See Transportation of United States Gov't Freight by Contract Carriers by Motor Vehicle, 301 I.C.C. 551; Baggett Transp. Co.--Petition for Exemption --Transp. for United States Gov't, 61 M.C.C. 771
 
 
 [118]
 [W]e agree that the Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice. Compare SEC v. Chenery Corp., 332 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995] (1947); FCC v. WOKO, 329 U.S. 223 [67 S.Ct. 213, 91 L.Ed. 204] (1946).... [T]his kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday
 American Trucking Ass'ns, Inc. v. Atchison, T. & S.F. Ry. Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967); see Permian Basin Area Rate Cases, 390 U.S. 747, 784, 88 S.Ct. 1344, 1368, 20 L.Ed.2d 312 (1968); Ryder Truck Lines, Inc. v. United States, 716 F.2d 1369, 1381, 1385 (11th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1707, 80 L.Ed.2d 181 (1984).
 
 
 [119]
 For the same reasons, we cannot say that Congress tacitly approved the Commission's (nonexistent) "long-standing policy" by failing to reverse it in the 1980 Motor Carrier Act
 
 
 [120]
 Corn Prods. Ref. Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955) (citation omitted); see Piedmont & N. Ry. Co. v. Interstate Commerce Comm'n, 286 U.S. 299, 311-12, 52 S.Ct. 541, 545, 76 L.Ed. 1115 (1932); United States v. J.E. Mamiye & Sons, Inc., 665 F.2d 336, 340 (C.C.P.A.1981); Port of New York Auth. v. Baker, Watts & Co., 392 F.2d 497, 504 (D.C.Cir.1968)
 
 
 [121]
 5 U.S.C. Secs. 551, 553-559, 701-706, 1305, 3105, 3344, 5372, 7521 (1982)
 
 
 [122]
 Id. Sec. 706(2)(A)
 
 
 [123]
 Motor Vehicle Manufs. Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); accord, Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974)
 
 
 [124]
 Motor Vehicle Manufs. Ass'n, Inc. v. State Farm Mutual Automobile Ins. Co., 103 S.Ct. at 2867 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 138 (1971))
 
 
 [125]
 National Small Shipments Traffic Conference, Inc. v. Civil Aeronautics Bd., 618 F.2d 819, 826 (D.C.Cir.1980)
 
 
 [126]
 Cf. Local 814, Int'l Bhd. of Teamsters v. National Labor Relations Bd., 546 F.2d 989, 991 (D.C.Cir.1976) (per curiam) ("[W]here, as here, an agency is charged with administering a broad statutory mandate, courts must of necessity defer to agency judgment." (citations omitted)), cert. denied, 434 U.S. 818, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977)
 
 
 [127]
 American Trucking Ass'ns, Inc. v. Interstate Commerce Comm'n, 656 F.2d 1115, 1125 (5th Cir.1981) (quoting American Trucking Ass'n, Inc. v. United States, 642 F.2d 916, 920 (5th Cir.1981))
 
 
 [128]
 Center for Auto Safety v. Peck, 751 F.2d 1336, 1343 (D.C.Cir.1985) (quoting Office of Communication of United Church of Christ v. Federal Communications Comm'n, 707 F.2d 1413, 1440 (D.C.Cir.1983))
 
 
 [129]
 49 U.S.C. Secs. 10702(b), 10761(b), 10762(f) (1982)
 
 
 [130]
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 157 (1983) (Ex Parte No. MC-165)
 
 
 [131]
 49 U.S.C. Sec. 10101(a)(2) (1982)
 
 
 [132]
 That competitive disadvantage is not itself contrary to the Motor Carrier Acts may be seen in the provision stating that traffic diversion is not itself a ground for denying a certificate for licensing a new common carrier. See id. Sec. 10922(b)(2)(B); Refrigerated Transp. Co. v. Interstate Commerce Comm'n, 709 F.2d 1430, 1433 (11th Cir.1983) (per curiam)
 
 
 [133]
 49 U.S.C. Sec. 10101(a)
 
 
 [134]
 See id. Secs. 10101-11917
 
 
 [135]
 See Joint Brief for Petitioners and Intervening Petitioners at 34, 39, Nos. 83-1581, 83-1761 & 83-1973
 
 
 [136]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 166 (1983) (Ex Parte No. MC-165) (Andre, Comm'r, concurring)
 
 
 [137]
 See id. at 164
 
 
 [138]
 See 49 U.S.C. Secs. 10704(a)(1), (c)(1), (f), 10708(a)(1) (1982)
 
 
 [139]
 See id. Secs. 10704(f), 10708(f)
 
 
 [140]
 Experience with transportation sectors not covered by tariff-filing requirements demonstrates that " 'open pricing' ... is not necessary to achieve acceptable competitive performance." Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 165 (1983) (Ex Parte No. MC-165 (Andre, Comm'r, concurring)
 
 
 [141]
 Given the nature of contract carriage, in which many of the essential terms of the carrier's undertaking are in the private contract and not the public tariff, it appears that a carrier truly interested in offering a competitive service would have to contact the shipper regardless of whether tariffs are filed
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 154 n. 8; see id. at 158-59 n. 15 ("[T]here is no statutory requirement that contract tariffs include all the particulars of the proffered service, and indeed it is unlikely that they could. See 49 U.S.C. Sec. 10762(a)(1). Consequently, the easy price comparison that is the foundation of the open price argument has never been a real possibility.").
 
 
 [142]
 See id. at 166 (Andre, Comm'r, concurring); accord, Great Atlantic & Pacific Tea Co. v. Federal Trade Comm'n, 440 U.S. 69, 80-81, 99 S.Ct. 925, 933, 59 L.Ed.2d 153 (1979); National Small Shipments Traffic Conference, Inc. v. Civil Aeronautics Bd., 618 F.2d 819, 830 (D.C.Cir.1980)
 
 
 [143]
 [T]he posting of prices that we are here concerned with takes place in the context of rules that impose additional cost and delay in effecting price changes. These rules provide for the possibility of a legal challenge to the posted prices, wholly apart from their acceptability in the marketplace. Given these facts, and considering the demonstrated competitive vigor in the already exempt trucking sectors, we believe that disinterested experts would agree that elimination of the tariff requirement will enhance competition. The support of the FTC for the proposed exemption is strong evidence that our belief is correct
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 159 n. 15; see id. at 165-66 (Andre, Comm'r, concurring).
 
 
 [144]
 See 49 U.S.C. Sec. 10922(b)-(c), (g) (1982)
 
 
 [145]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 160-61; id. at 167 (Andre, Comm'r, concurring)
 Petitioners' arguments also overlook some competitive advantages common carriers retain even under the Commission's exemption. For example, common carriers can typically serve a new shipper without delay (within the scope of their certificates), while contract carriers must apply for a permit to serve each new shipper.
 
 
 [146]
 Central & Southern Motor Freight Tariff Ass'n, Inc. v. United States, Nos. 83-1581, 83-1740 & 83-1973 (D.C.Cir. 28 Sept. 1984)
 
 
 [147]
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 159 n. 16. Moreover, if a carrier can serve the contract and common carriage trade simultaneously, then rates and service mix will be dictated by the needs of shippers--a marketplace result consistent with the objectives of the 1980 Motor Carrier Act
 
 
 [148]
 The proposed reduction in notice requirements [from 30 to either one or five days] should also assist common carriers in meeting competition from motor contract carriers and rail carriers, and in attracting traffic from private carriage. The Commission recently exempted contract carriers from all tariff filing requirements. Ex Parte No. MC-165, Exemption of Motor Contract Carriers From Tariff Filing Requirements, 48 FR 24388 (June 1, 1983). This exemption permits contract carriers to change rates with no regulatory delay. The proposal here, while not eliminating all filing requirements for common carriers, will nonetheless greatly reduce regulatory burdens on these carriers and enhance their competitive opportunity
 Short Notice Effectiveness for Independently Filed Motor Carriers and Freight Forwarded Rates, 48 Fed.Reg. 34,307, 34,308 (1983) (Ex Parte No. MC-170) (notice of proposed rulemaking).
 
 
 [149]
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 159; see id. ("The better approach is to search for ways to relieve any unnecessary regulatory burdens from all transportation sectors."); id. at 167-68 (Andre, Comm'r, concurring)
 
 
 [150]
 Cf. Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 159 ("To the extent that these burdens cannot be lifted identically, it is because of the distinct treatment of these two sectors in the act."). Congress imposed tariff-filing requirements by statute and did not allow exemption in the belief that such requirements are necessary to ensure that common carriers live up to their "common carrier obligation" and publish nondiscriminatory rates covering all of the services they hold out. See 49 U.S.C. Sec. 10741 (1982)
 Petitioners assert that the advocates of authority to haul contract and common carriage represented that they would rely on tariff-filing requirements to enforce the Motor Carrier Act's prohibition against discrimination among shippers engaged in common carriage. Whatever the force of that argument in gaining passage of dual operating authority, there is no evidence that Congress relied on tariff publication as a precondition to passage of dual operating authority and the Commission has provided a reasoned explanation why such protection is not necessary now.
 
 
 [151]
 Joint Brief for the Interstate Commerce Commission and the United States of America at 39, Nos. 83-1581, 83-1740, 83-1761 & 83-1973
 
 
 [152]
 See 49 U.S.C. Secs. 10704(c), 10741(b) (1982)
 
 
 [153]
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 160
 
 
 [154]
 See id. at 160
 
 
 [155]
 Id
 
 
 [156]
 Id. at 157
 
 
 [157]
 See id
 
 
 [158]
 Id
 
 
 [159]
 Id. at 163 (Andre, Comm'r, concurring)
 
 
 [160]
 Petitioners' insistence that tariff filing is more a nuisance than a substantial cost is belied by their assertion that unilateral tariff filing would put common carriers at a severe competitive disadvantage. See supra p. 43
 
 
 [161]
 See Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 157 n. 13 ("We conclude that the costs are not justified by the benefits and that relief is thus appropraite [sic]."); id. at 164 (Andre, Comm'r, concurring) ("Whatever the arguable range of the costs thus incurred, the sums are clearly not trivial. The question that then arises is this: what are the public benefits that warrants the continued imposition of nontrivial costs on the transportation system? The answer is that there are none.")
 
 
 [162]
 See JDA at 8-9 & n. 22, 45-50, 96, 98, 103, 112-13, 122, 129-30, 144 (comments by Federal Trade Commission, Small Business Administration, and various contract carriers)
 
 
 [163]
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 157-58
 
 
 [164]
 See 49 U.S.C. Sec. 10762(a)(2) (1982)
 
 
 [165]
 Id. Sec. 10762(d)(1)
 
 
 [166]
 49 C.F.R. Sec. 1307.6(a) (1982), removed, Exemption of Motor Contract Carriers from Tariff Filing Requirements, 48 Fed.Reg. 24,388, 24,390 (1983) (codified at 49 C.F.R. Sec. 1307.0 (1983)), removed, Revision of Tariff Regulations, all Carriers, 49 Fed.Reg. 38,614, 38,641 (1984)
 
 
 [167]
 Id
 
 
 [168]
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 157 n. 12 (1983) (Ex Parte No. MC-165)
 
 
 [169]
 See JDA at 8, 91, 114, 221 (comments by Federal Trade Commission, a shipper of contract carriage, and two contract carriers); Supplemental Joint App. at 28, 33 (comments by two shippers of contract carriage)
 
 
 [170]
 Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. at 157
 
 
 [171]
 Id. at 161
 
 
 [172]
 Pub.L. No. 96-454, 94 Stat. 2011 (codified at scattered sections of 49 U.S.C.)
 
 
 [173]
 See H.R.REP. NO. 1372, 96th Cong., 2d Sess. 2, 5-6, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 4271, 4272, 4275
 
 
 [174]
 See Household Goods Transportation Act of 1980, Pub.L. No. 96-454, Sec. 3(a)(1), 94 Stat. 2011, 2011-12 (codified at 49 U.S.C. Sec. 10102(11)(A) (1982)) (defining "household goods" to mean "personal effects and property used or to be used in a dwelling when a part of the equipment or supply of such dwelling and such other similar property as the Commission may provide by regulation.")
 
 
 [175]
 See id., 94 Stat. at 2012 (codified at 49 U.S.C. Sec. 10102(11)(B)) (defining "household goods" to mean "furniture, fixtures, equipment, and the property of stores, offices, museums, institutions, hospitals or other establishments when a part of the stock, equipment, or supply of such stores, offices, museums, institutions, hospitals, or other establishments and such other similar property as the Commission may provide by regulation.")
 
 
 [176]
 See id., 94 Stat. at 2012 (codified at 49 U.S.C. Sec. 10102(11)(C)) (defining "household goods" to mean "articles, including objects of art, displays, and exhibits, which because of their unusual nature or value require the specialized handling and equipment usually employed in moving household goods and such other similar articles as the Commission may provide by regulation.")
 Although designed to protect consumers, the Household Goods Transportation Act of 1980 was passed by the same Congress that passed the Motor Carrier Act of 1980 (which evinced a marked distrust of regulation). Of particular importance to this petition, "section 4[ (a) of the Household Goods Transportation Act, 49 U.S.C. Sec. 10734(a)(1) (1982) ] ... indicates that household goods carriers are subject to the provisions of 49 U.S.C. 10762, including its exemption provisions." Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150, 161 (1983) (Ex Parte No. MC-165).
 
 
 [177]
 See Motor Contract Carriers of Property --Proposal to Allow Issuance of Permits Authorizing Industry-Wide Service, 133 M.C.C. 298, 303 (served 28 Dec. 1983) (Ex Parte No. MC-165 (Sub-No. 1)), petition for review dismissed as not ripe sub nom. American Trucking Ass'ns, Inc. v. Interstate Commerce Comm'n, 747 F.2d 787 (D.C.Cir.1984)
 
 
 [178]
 Id. at 302
 
 
 [179]
 Deukmejian v. Nuclear Regulatory Comm'n, 751 F.2d 1287, 1326 n. 240 (D.C.Cir.1984)
 
 
 [180]
 See Motor Contract Carriers of Property --Proposal to Allow Issuance of Permits Authorizing Industry-Wide Service, 133 M.C.C. at 299-300, 301-02
 
 
 [181]
 See id. at 304
 
 
 [182]
 See Brief for Petitioner at 7 n. 4, No. 83-1740
 
 
 [183]
 See 49 U.S.C. Sec. 10102(14)(B) (1982)
 
 
 [184]
 Motor Contract Carriers of Property --Proposal to Allow Issuance of Permits Authorizing Industry-Wide Service, 133 M.C.C. at 301
 
 
 [185]
 See 49 C.F.R. Sec. 1056.1(b)(1) (1984)
 
 
 [186]
 Motor Contract Carriers of Property --Proposal to Allow Issuance of Permits Authorizing Industry-Wide Service, 133 M.C.C. at 302. (citations omitted)
 
 
 [187]
 See 49 U.S.C. Sec. 10925(e) (1982); Global Van Lines, Inc. v. Interstate Commerce Comm'n, 704 F.2d 829, 833-34 (5th Cir.1983)