HOUSEHOLD GOODS FORWARDERS TARIFF BUREAU, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

No. 91–1350.

United States Court of Appeals, District of Columbia Circuit.

Argued April 23, 1992.
Decided June 30, 1992.

Alan F. Wohlstetter, with whom Stanley I. Goldman was on the brief, for petitioner.

Michael L. Martin, Atty., I.C.C., with whom James F. Rill, Asst. Atty. Gen., Robert B. Nicholson, John P. Fonte, and John C. Filippini, Attys., Dept. of Justice, and Robert S. Burk, General Counsel and Craig M. Keats, Associate General Counsel, I.C.C., were on the brief, for respondents.

Ellen D. Hanson, Atty., I.C.C., also entered an appearance, for respondents.

Before RUTH BADER GINSBURG, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The Household Goods Forwarders Tariff Bureau (HGFTB) appeals the decision of the Interstate Commerce Commission (ICC or Commission) to revoke its antitrust immunity. Because the Commission applied the correct standard in evaluating the need for an antitrust exemption and because the Commission adequately articulated its reasons for revoking the immunity, we deny HGFTB's petition for review.

## I.

The Household Goods Forwarders Tariff Bureau (HGFTB) is a rate bureau for household goods freight forwarders. A domestic freight forwarder is a common carrier that assembles and consolidates smaller shipments at origin, sorts them for delivery at destination and arranges for a motor or rail carrier to perform the line-haul transportation between the assembly and distribution points. 49 U.S.C. § 10102(9). The forwarder "assumes responsibility for the transportation from the place of receipt to the place of destination." *Id.* This case concerns "household goods" (HHG) freight forwarders. HHG freight forwarders handle used household goods, unaccompanied baggage and used automobiles. *Id.* § 10102(12).

As common carriers subject to the ICC's jurisdiction, HHG freight forwarders must file tariffs with the ICC setting forth their rates and charges. During the nineteen year period preceding the Commission action leading to this appeal, *i.e.* from 1972–1991, the rates for HHG freight forwarders were set collectively by HGFTB. HGFTB was exempted from the antitrust laws for this purpose. *See Household Goods Forwarders Tariff Bureau–Agreement,* Section 5a Application No. 106 (ICC Apr. 25, 1972) (*1972 Decision*).

Another transporter is the "household goods motor carrier." An HHG motor carrier transports HHGs from place to place. HHG motor carriers have their own authorized rate bureau, the Household Goods Carriers' Bureau (HGCB), which collectively sets rates. HHG freight forwarders, in conducting their business, utilize the services of HHG motor carriers. The cost of motor carrier service is a major component of HHG forwarder rates. *See Household Goods Forwarders Tariff Bureau,* Section 5a Application No. 106 at 6 (ICC June 5, 1991) (*1991 Decision*).

The controversy in this case involves the legislative and regulatory history of common carrier antitrust exemptions. In the 1940s, Congress passed the Reed–Bulwinkle Act, Pub.L. No. 80–662, 62 Stat. 472 (1948) (current version at 49 U.S.C. § 10706), which gave the ICC the authority to grant antitrust immunity to common carriers' collective ratemaking to the extent the Commission determined such arrangements to be in the public interest. According to the Act, in order to receive antitrust immunity, a group of carriers must submit its collective ratemaking agreement to the Commission for approval and must demonstrate that the agreement will *further* the national transportation policy (NTP).[1] 49 U.S.C. § 10706(a)(2)(A).

As part of its deregulation trend, however, Congress has directly limited the ability of many types of carriers to engage in collective conduct. *See generally Central & S. Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 309–12 (D.C.Cir.), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). The Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (codified in scattered sections of 49 U.S.C.) (MCA 80), limited the degree to which HHG motor carriers could engage in collective ratemaking. Under the MCA 80, HHG motor carriers may no longer engage in most activities involving collective rate-

1. The NTP is defined at 49 U.S.C. § 10101(a).

making for single-line transportation.[2] *See* 49 U.S.C. § 10706(b)(3)(D). Pertinent exceptions to this prohibition allow the HGCB to consider general rate increases and decreases as well as changes in commodity classifications and tariff structures. *See id.* § 10706(b)(3)(D)(i)–(iv). In addition, the legislation includes a presumption that any motor carrier rate bureau agreement falling within these exceptions will be granted antitrust immunity, unless the Commission finds that the agreement is *inconsistent* with the NTP. *Id.* § 10706(b)(2).

At the request of the freight forwarder industry, Congress passed the Surface Freight Forwarder Deregulation Act of 1986 (SFFDA), Pub.L. No. 99–521, 100 Stat. 2993 (codified in scattered sections of 49 U.S.C.), which withdrew antitrust immunity for freight forwarders of general commodities. However, Congress acceded to the request of the HHG freight forwarders that their antitrust immunity remain intact. Because the antitrust immunity for HHG freight forwarders was unaltered by the 1986 legislation, they remain subject to the original prerequisite that they demonstrate that their agreements will further the NTP before they can receive antitrust immunity. *See* 49 U.S.C. § 10706(c).

Meanwhile, in January 1978, the Commission issued a decision reopening all previously approved non-rail collective ratemaking agreements to reevaluate whether those agreements continued to merit antitrust exemption. *Reopening of Section 5a Application Proceedings to Take Additional Evidence,* Ex Parte No. 297 (Sub–No. 4) (ICC Jan. 26, 1978) (*Reopening Decision*). Twelve years later,[3] after reviewing the application submitted by the HHG freight forwarders in response to the *Reopening Decision,* the Commission issued a decision calling into question the HHG for-

warders' antitrust immunity. *Household Goods Forwarders Tariff Bureau,* Section 5a Application No. 106 (ICC Nov. 28, 1989) (*1989 Decision*). In conformance with a three-part test set forth in the *Reopening Decision,* the *1989 Decision* directed HGFTB to establish (1) that its agreements would further the NTP and (2) that either (a) its agreements would not have anticompetitive effects, or (b) if anti-competitive effects were found, the benefits to the public interest would outweigh those effects. *Id.* at 2; *Reopening Decision* at 3. The Commission proposed to apply the test using the standards it applied to HGCB agreements under MCA 80. The Commission explained:

> Thus, in addition to the provisions of 49 U.S.C. 10706(b)(3)(D), generally prohibiting the voting on and discussion of single-line rates, we propose to examine the agreement with a view to, for example, protecting the right of independent action and guaranteeing that meetings and procedures be open and fair (*see* 49 U.S.C. 10706(b)(3)(B)(ii) and 49 U.S.C. 10706(b)(3)(B)(iv)–(vii)).

*1989 Decision* at 2–3. Although the Commission acknowledged that it was not required by statute to apply the additional standards to HHG forwarders, the Commission expressed the belief that because "freight forwarders exhibit many characteristics of motor carriers, ... the goals of the NTP, particularly those favoring increased competition, support application of comparable conditions and prohibitions." *Id.* at 2.

HGFTB, in response, emphasized that it did not seek the blanket antitrust immunity conferred in 1972. Rather, the Bureau simply sought immunity for the same types of collective activity engaged in, with MCA 80 permission, by the HHG motor carriers.[4]

---

**2.** Single line rates are rates that involve only one carrier. 49 U.S.C. § 10706(a)(1)(B), (b)(1).

**3.** Apparently, the *Reopening* proceeding was held in abeyance pending the disposition of several relevant legislative proposals.

**4.** Specifically, HGFTB wants to be able to consider general rate increases and decreases, changes in commodity classifications and tariff structures.

In addition to these collective activities, MCA 80 allows the HGCB to publish member rates and perform other support services. HGFTB also wants to perform these support functions. The ICC, however, maintains that these types of support activities may be legally performed by the Bureau without an antitrust exemption. *See 1991 Decision* at 5.

*1991 Decision* at 3–4. HGFTB claimed that this protection was necessary to enable HHG freight forwarders to compete on a fair basis with HHG motor carriers.[5] *Id.* HGFTB also claimed that allowing it to retain its antitrust immunity would further the NTP. *Id.* at 4.

In a 3–2 decision, the ICC concluded that HGFTB failed to meet its burden of establishing that its agreement would further the goals of the NTP. *Id.* at 6–7. The Commission therefore revoked the Bureau's antitrust immunity. *Id.* at 7. The Commission found that HGFTB had not provided concrete evidence as to why its members required collective action to remain competitive, had failed to show that its collective activities would not be anticompetitive and had not demonstrated that the anticompetitive aspects of its collective activities would be outweighed by public benefits. *Id.* at 6–7. In arriving at its conclusions, the Commission relied on comments submitted by the Department of Defense (DOD) describing DOD's experience employing HHG freight forwarders unaffiliated with the Tariff Bureau. The Commission reasoned that DOD's experience showed that HHG freight forwarders can thrive without antitrust immunity. *Id.* at 6.

## II.

■■■■ HGFTB claims that the Commission's decision to revoke its antitrust immunity was arbitrary and capricious in several respects. The Bureau first claims that because the Commission had previously granted it immunity and because the law has not changed since that time, there was no basis for the Commission's reversal. It is undisputed that although the codification of the relevant statutes has changed over time, the substantive law concerning antitrust exemptions for HHG freight forwarders has not changed since HGFTB's antitrust exemption was granted twenty years ago. The unchanged nature of the law, however, does not prohibit the Commission from reexamining whether an antitrust exemption continues to be justified. An agency may change its position as long as it provides a reasoned basis for its decision. *See National Classification Comm. v. United States,* 779 F.2d 687, 696 (D.C.Cir. 1985). In this case, the Commission's decision is well supported. The Commission adequately explained why HGFTB's arguments failed to establish that the HHG freight forwarders' agreement would further the goals of the NTP[6] and why the agreement's anticompetitive effects were not outweighed by benefits to the public.

HGFTB next claims that the test applied by the ICC is itself arbitrary and capricious. HGFTB claims that the Commission relied on these factors in revoking the exemption: (1) "no single-line collective activity would be approved for the HGFTB," *1991 Decision* at 2; (2) "household goods forwarder costs, dominated by the cost of underlying motor carrier transportation, is (sic) almost entirely variable in nature," *id.* at 6; and (3) rate bureau rates are collectively set and are therefore anticompetitive, *id.* The Bureau claims that this test is arbitrary and capricious because it can never be met by an HHG forwarder. This argument misconstrues the nature of the ICC inquiry. As was noted above, the test applied by the Commission sought to determine whether HGFTB's collective activities would further the NTP and whether these activities were either competitive or otherwise justifiable. Thus, rather than constituting the test itself, the three factors described earlier in this paragraph represent either non-decisional factors or the Com-

---

5. Although HHG forwarders utilize the services of motor carriers, because consumers may choose to transport their goods solely by motor carrier or to employ the full services of a forwarder, the two can be in some instances competitors.

6. These reasons included the fact that when the Department of Defense refused to accept collectively set rates from freight forwarders, it reported a decrease in rates and an increase in

efficiency. This evidence is sufficient to justify the agency's action. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)) (agency's conclusions will be upheld if supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

mission's *conclusions* as to why HGFTB failed to meet the test's requirements.

Looking at HGFTB's objections separately, we note that although the Commission's *1989 Decision* stated that "no single-line collective activity would be approved for the HGFTB," its *1991 Decision* indicates that the Commission seriously considered HGFTB's assertion that its limited activities should fall within an exception to the prohibition against single-line collective ratemaking. *1991 Decision* at 2–3. The fact that HHG forwarders use only single-line rates was therefore not dispositive. The Commission's decision to rescind HGFTB's antitrust immunity was based instead on its conclusion that the Bureau's collective activity did not "enhance the goals of the NTP". *1991 Decision* at 6.

HGFTB also complains that it was arbitrary and capricious for the Commission to deny it antitrust immunity on the ground that HHG forwarder costs are variable. It reasons that because HHG freight forwarder costs are in fact largely variable, the Bureau can never meet this aspect of the test. As was noted above, the Bureau confuses the ICC's test with its particular application. The test requirement that the collective activity further the NTP can be met. The fact that HHG forwarder costs are largely variable led the Commission to the reasonable conclusion that destructive competition would be unlikely among household goods forwarders in the absence of antitrust immunity, and thus immunity would not further the NTP in that respect. *1991 Decision* at 6–7.

In addition, the Commission's finding that HGFTB's collective activity is inherently anticompetitive does not automatically foreclose the possibility of an exemption. HGFTB was entitled to demonstrate that the public benefits of its anticompetitive activity justified an exemption. It failed to make this showing.

Finally, HGFTB claims that because the Commission applied the motor carrier standard in determining whether an antitrust exemption was warranted, it should have applied the motor carriers' statutory presumption as well. This argument is without merit. The statute granting the Commission the authority to decide whether to shelter HHG forwarders' collective action from the reach of antitrust laws allows the Commission to exercise its discretion in deciding whether an agreement furthers the NTP. *See* 49 U.S.C. § 10706(c). Thus, the Commission may properly *choose* to apply to HHG forwarders the same standard that Congress mandated it apply to motor carriers. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This is not true with respect to the burden the statute places on the Bureau. The law grants motor carriers a favorable presumption in that, if their agreement meets certain criteria and is not *inconsistent* with the NTP, an exemption will be granted. On the other hand, section 10706(c) commands that an exemption be granted to HHG forwarders only upon an affirmative showing that the HHG forwarders' agreement will *further* the NTP. We therefore conclude that the Commission correctly refused to apply the motor carriers' presumption to the proposed HGFTB agreement.[7]

### III.

For the foregoing reasons, the petition for review is

*Denied.*

---

7. HGFTB argues that because Congress specifically allowed the HHG freight forwarders to keep their exemption when it enacted the SFFDA, the Commission must grant them an exemption. This misreads the SFFDA, in which Congress merely agreed to refrain from directly eliminating the exemption by statute.

HGFTB also argues that the Commission violated section 558(c) of the APA, 5 U.S.C. § 558(c), which conditions an agency's power to revoke a license, by revoking the exemption "on the basis of new criteria under which it is impossible for any forwarder rate bureau to be approved" and failing to "apply the motor carrier standard which it announced would govern the HGFTB agreement." HGFTB Brief at 43. This argument is without merit because, as we noted above, the Commission did not apply impossible criteria but did permissibly apply the motor carrier standard while refusing to apply the motor carrier presumption.